UNITED STATES of America

v.

Mike MANOS, Appellant.

No. 14724.

United States Court of Appeals
Third Circuit.

Argued June 1, 1964.

Decided Jan. 26, 1965.

Sherman K. Levine, New Castle, Pa., for appellant.

Robert E. Tucker, Asst. U. S. Atty., Pittsburgh, Pa. (Gustave Diamond, U. S. Atty., Samuel J. Reich, First Asst. U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and KALODNER and GANEY, Circuit Judges.

GANEY, Circuit Judge.

Appellant, Mike Manos, was found guilty on all counts of a three count information by a jury of having willfully violated the special tax and registration provisions of the 1954 Internal Revenue Code, relating to taxes in accepting wagers. In Count One the defendant was charged with "being a person engaged in the business of accepting wagers and in receiving wagers for or on behalf of a person or persons engaged in the business of accepting wagers, and as such being required to pay the special tax imposed by Section 4411 of Title 26 United States Code, and did wilfully fail to pay said tax as required by said section; contrary * * *";[1] in Count Two as being a person so engaged, as indicated in Count One, he did fail to register

with the official in charge of the internal revenue district, as well as with the District Director of the Internal Revenue Service at Pittsburgh, in violation of Section 4412 of Title 26 United States Code;[2] and in the Third Count as a person so engaged, as indicated in Count One, which acts made him liable for payment of the special tax as imposed by Section 4411 of Title 26 United States Code, and his performance of these acts without having paid said tax, as required by that section. At the close of the Government's case, appellant made a motion for judgment of acquittal which was denied by the Court, but did not thereafter renew it at the close of all the testimony, even though, in their briefs and at argument, both counsel for the appellant and the appellee assumed he had. He was convicted and sentenced to pay a fine.[3]

The facts, briefly, show that Francis Larkin, an employee of the Intelligence Division of the Internal Revenue Service, on April 13, 1963, entered the Colonial Shoe Shine Parlor, operated by Mike Manos, the appellant, on East Washington Street in New Castle, Pennsylvania. After being there a few minutes, he saw a man walk up to the appellant and ask for "773 on the early race." Appellant pulled out a piece of white paper from his pocket, wrote the number down and then put the bet slip and money back into

---

1. Section 4411 of Title 26 United States Code, provides: "There shall be imposed a special tax of $50 per year to be paid by each person who is liable for tax under Section 4401 or who is engaged in receiving wagers for or on behalf of any person so liable." (26 U.S.C. § 4401(c), as amended, provides: "Persons liable for tax.—Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under this subchapter on all wagers placed with him. Each person who conducts any wagering pool or lottery shall be liable for and shall pay the tax under this subchapter on all wagers placed in such pool or lottery. Any person required to register under Section 4412 who receives wagers for or on behalf of another person without having registered under Section 4412 the name and place of residence of such other person shall be liable for

and shall pay the tax under this subchapter on all such wagers received by him.")

2. Section 4412 of Title 26 United States Code, provides: Registration "(a) Requirement.—Each person required to pay a special tax under this subchapter shall register with the official in charge of the internal revenue district—(1) his name and place of residence; (2) if he is liable for tax under subchapter A, each place of business where the activity which makes him so liable is carried on, and the name and place of residence of each person who is engaged in receiving wagers for him or on his behalf; and (3) if he is engaged in receiving wagers for or on behalf of any person liable for tax under subchapter A, the name and place of residence of each such person."

3. 223 F.Supp. 137 (W.D.Pa., 1963).

his pocket. On April 15, 1963, he again entered the shoeshine parlor of appellant, walked up to him, asked for "850 on the new stock for fifty cents." Appellant again pulled out a white piece of paper, wrote the number down and returned the paper and money to his pocket. On April 27th, he again returned to the shoeshine shop and asked appellant for "926 for fifty cents on the race." Appellant went through the same procedure of writing the number down on a piece of paper and placed the money and paper in his pocket.

For a proper understanding of the background of this testimony it is necessary to have, and the record shows, the meaning of the characteristic, special language or patois which the shadowy figures of the underworld indulge. As explained by Francis Larkin, a Government agent of long experience in the numbers game, a lottery play is usually an occurrence where an individual desires to play what is called a "number". A player can play the "number" on what is known as the old stock, or the new stock, the results of which are derived from certain activities on the New York Stock Exchange. He selects a number of three figures and bets a certain amount of money that these figures will be the winning number. As an example, he can play the three digits straight or combine them in a box which is to say he can play them in six different combinations. With respect to horseplaying, he can pick out a certain race, an early race or a late race, and the winning number is determined by the total amount of certain mutuel bets at a specified track for a specified race, that is, the winning number is either determined through the activities of the New York Stock Exchange or, with respect to horseracing, with the total amount bet on the parimutuel machines for a specified race at a specified track. The numbers game is divided into three parts, a writer, a pick-up man and a banker. A numbers writer is one who actually writes the number for the player and takes the bet from him and the pick-up man is the one who contacts the writer and picks up the plays for the day's activities, that is, the number slips and then, in turn, delivers them to the banker, and, as can be seen, the player or customer bets, in reality, against the banker, and the numbers writer and pick-up man are merely adjuncts to his business.

After describing this method of play and the manner in which the numbers game is carried out, Larkin testified that he had been in New Castle, Pennsylvania, from April 1st, to April 28th, 1963, periodically, during which time he had other places than the Colonial Shoe Shine Parlor under surveillance. He testified that he never received anything by way of receipts from appellant for the bets he placed.

■■ This part of the record constitutes that portion thereof, concerning which, the first allegation of error is concerned with—the insufficiency of the evidence to warrant a conviction.

However, as has been indicated, the only motion for judgment of acquittal was made by the appellant at the close of the Government's case, which was denied, though it is to be remembered that this is an information and, unlike an indictment—which cannot be altered except by a Grand Jury—it could have been amended at any time by the United States Attorney to meet the objections which the defendant now alleges to be error by reason of a variation between the allegata and the probata. Having proceeded, therefore, to put on evidence by way of defense, appellant waived his motion for judgment of acquittal. United States v. Calderon, 348 U.S. 160, 164, n. 1, 75 S.Ct. 186, 99 L.Ed. 202 (1954); United States v. Kenny, 236 F.2d 128 (C.A.3, 1956), cert. den. 352 U.S. 894, 77 S.Ct. 133, 1 L.Ed.2d 87; Lii v. United States, 9 Cir., 198 F.2d 109; Gaunt v. United States, 1 Cir., 184 F.2d 284. Never having renewed his motion for judgment of acquittal nor having excepted to the trial court's charge on the grounds of insufficiency of the evidence, he has failed to preserve his right to question the sufficiency of the evidence to support

the charges in the information. Lucas v. United States, 9 Cir., 325 F.2d 867 (1963); Edwards v. United States, 8 Cir., 333 F.2d 588 (C.A.8, 1964); Gendron v. United States, 295 F.2d 897 (C.A. 8, 1961); United States v. Ginsburg, 224 F.Supp. 129, 132 (E.D.Pa., 1963).

The lower court, in its opinion, goes only into the appellant's request for a new trial, which was denied, and no mention is made of a motion for judgment of acquittal—although appellant erroneously included it as one of the grounds in his motion for a new trial—for the obvious reason that it was not before the court.

Our next inquiry is to determine whether, upon a review of the entire record, the trial court, in order to prevent a miscarriage of justice—if "substantial rights of the appellant were affected—should have raised the question of sufficiency of the evidence on its own motion and, additionally, not having done so, shall this Court do so under what has been designated as the Plain Error Rule, 52(b).[4]

It is to be remembered that Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., sets forth the time and place for the making of objections by counsel to the charge of the court, the general rule being that, lacking compliance with this provision, the defendant is precluded from any reviewing action by this Court. United States v. Kaadt, 7 Cir., 171 F.2d 600; Felton v. United States, 83 U.S.App.D.C. 277, 170 F.2d

153. In the ends sought to be attained, this rule is quite similar to Rule 51 of the Federal Rules of Civil Procedure,[5] whose purpose is to require objections in order that the trial judge may be advised of any error he has committed and the opportunity for correction. Stilwell v. Hertz Drivurself Stations, Inc., 3 Cir., 174 F.2d 714; Alcaro v. Jean Jordeau, 3 Cir., 138 F.2d 767, 771.[6]

An examination of the cases reveals that, while a general rule may not be laid down, definitive of plain error, "affecting substantial rights [which] may be noticed", since the varying factual context of the cases makes its persuasive only, dependent upon the impact of the offending error thereon, nevertheless, certain guidelines have been laid out which are helpful in our examination here.

The Court, in United States v. Vasen, 7 Cir., 222 F.2d 3, made a scholarly discussion of the subject and held, under the circumstances there presented, no such error as affected the substantial rights of the defendant was committed. There, the Judge, after the jury had been sworn, made certain comments to them, before they had received any evidence in the case, to which no objection was taken by counsel, and in refusing to invoke the Plain Error Rule, held "The error must be such as would result in manifest miscarriage of justice or affect seriously the fairness of judicial proceedings." This seems to be the general criterion which the courts have followed. United States v. Bazzell, 7 Cir., 187 F.2d 878; Smith v. United States, 9 Cir., 173 F.2d 181;

---

4. Rule 52(b) of the Federal Rules of Criminal Procedure reads as follows: "Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

5. This Rule reads as follows: "INSTRUCTIONS TO JURY: OBJECTION At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court

shall instruct the jury after the arguments are completed. No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

6. At page 771 of 138 F.2d of its opinion, the court states: "Rule 51 is designed to preclude counsel from assigning for error on appeal matter at trial which he did not fairly and timely call to the attention of the trial court."

Robertson v. United States, 84 U.S.App. D.C. 185, 171 F.2d 345; Benson v. United States, 5 Cir., 112 F.2d 422; United States v. Lawrenson, 4 Cir., 298 F.2d 880, 884.

An examination of the statutes, which have been adverted to heretofore, §§ 4401, 4411, 4412, 4421, 26 U.S.C.A., reveals there is a differentiation between a banker and numbers writer, that is between a person who is engaged in the business of accepting wagers, a banker and a receiver, one who receives wagers for or on behalf of any person. This differentiation is set out in United States v. Calamaro, 354 U.S. 351 at 353, 77 S. Ct. 1138, 1 L.Ed.2d 1394. While, in that case, under the facts there obtaining, the Court held that the acceptor and receiver were labels which could be interchanged —were different sides of the same coin— by reason of the fact that the particular problem involved was whether or not a pick-up man who picked up the slips from a numbers writer or receiver and carried them to the banker, was an individual who came within the intendment of the statute, making him criminally liable. The Court held he was not. It is submitted, United States v. Calamaro, supra, is not to be construed as holding that no differentiation obtains in the various sections of the statute here in question. This for the reason that with respect to a banker, the person against whom the player bets, must pay a 10% excise tax on the gross amount of the wagers he receives, pursuant to § 4401 (a), as well as a special tax of $50 per year, as set forth in § 4411, and, additionally, he must register and furnish certain information to the Internal Revenue District in which he is located, § 4412 (a). However, with respect to a person who receives wagers, a writer for or on behalf of a person so engaged in the business of accepting wagers, he is subject only to the $50 special tax and the registration requirements for a writer are much less rigorous than for bankers. This is so because in the registration prescribed in § 4412(a) (2), which is that for a banker, the information which he must give is far more detailed than that for a receiver or writer, as set forth in § 4412(a) (3). This differentiation was recognized in United States v. Pepe, 198 F.Supp. 226, aff'd per curiam by this Court 1964, 339 F.2d 264, where the defendant was charged by information with engaging in the business of accepting wagers and unlawfully failing to register, as well as to pay the special tax required by law. It was there held that, since the Court's charge permitted the jury to convict Pepe of being a writer of numbers, when there was no such charge in the information, there was created such a variance between it and the charge of the court to permit the conviction of another offense, which affected the substantial rights of the accused.

■ However, in our case, the information alleges accepting and receiving conjunctively, and giving due credence to the differentiation set forth in the respective sections of the statute and to the nomenclature set forth in United States v. Calamaro, supra, we can find no fatal variance between the allegata and the probata which would warrant the invoking of the Plain Error Rule, 52(b). This for the reason that the appellant could be, under the circumstances here presented in the record, a small, independent banker, an individual operating on a very limited scale, who was accepting bets, whom the jury could believe a player, such as Larkin, the Government agent, was betting against. It was also possible for the jury to believe, and the inference could well have been drawn, additionally, that he was receiving wagers for and on behalf of one engaged in the business of accepting wagers, that he was a writer who would turn the amounts received over to an accepter of wagers, a banker. This inference could be drawn from the fact that the agents, under lawful authority of a search warrant, searched the place and could find no paraphernalia, furnishings or equipment which might indicate he was a banker on any large scale but, from the absence of such material, it could be inferred that he was receiving

monies, that is receiving the bets for or on behalf of another, to wit, a banker who was engaged in the business of accepting wagers, in that a pick-up man takes a day's play to the banker. In other words, it was quite possible for the jury to believe from this record that he could be both a small, independent banker and, at the same time, act as a receiver or writer turning over some of the wagers he received to one engaged in the business of accepting wagers.

Here, the information paints with a broad brush the entire sweep of the statute, by alleging in the conjunctive both accepting and receiving, thus charging the appellant both as principal and agent, thereby covering every aspect of the gambling contract since the gravamen of the offense is the engaging in the business of accepting wagers, either as principal or agent. United States v. Pasha, 7 Cir., 332 F.2d 193, 195.

Under this analysis we cannot find any fatal variance between the allegata and the probata which would warrant this Court calling into play the Plain Error Rule 52(b)) since, under the facts and the inferences to be drawn therefrom, we find no substantial prejudice to the appellant's position.

The second principal contention made by the appellant is that when he was arrested at his place of business it was by two agents of the Internal Revenue Service, Intelligence Division, Shishido and Good. As part of the Government's case it called only one of the two agents, Shishido, who testified concerning the circumstances surrounding the arrest and the statements made by the appellant at the time. It did not call Agent Good who was present at the arrest and when statements attributed to the appellant were made. The record discloses that the appellant stated in the presence of both agents that he knew federal wagering stamps were necessary for one engaged in that business from hearing about it and from the newspapers. This testimony was offered by the Government to show the appellant had knowledge of the necessity for wagering stamps and, ac-

cordingly, his conduct was willful in not having them, within the terms of the statute. However, the appellant said he was not so engaged and that he never saw Agent Larkin on the days in question and, at one place in his testimony, that he never discussed the question of stamps with Shishido and later, that he didn't recall discussing them. The prosecuting attorney's explanation—made at sidebar—as to why the Government did not call Good, the other agent present at the arrest and when the statements were made by the appellant, was that his testimony would not have added any incriminating information in addition to that given by Shishido, and the jury had the choice of believing either. At the close of the trial court's instructions, the prosecuting attorney requested the court to charge additionally that the Government was not required to call witnesses when their evidence would be cumulative. Similarly, appellant's attorney called to the court's attention, also at sidebar, that the Government, not having called Agent Good, the jury could draw the inference that had he been called, his testimony would be adverse to that given by Shishido. In response to the prosecuting attorney's request and defense counsel's argument, the court added the following additional instructions to its charge:

"I neglected to mention a rule of evidence which we have, that is that when certain evidence is within the control of one party and would normally be produced by that party as a part of its case and such evidence is not produced then the jury is entitled if it sees fit to draw the inference that such evidence would be adverse to or would not support the case of the party failing to call them.

"Now, with regard to this case, the defendant has contended that this rule would apply with respect to the failure to call one of the arresting officers who arrested the defendant. You will recall the testimony as to who the officers were. I don't recall their names. And in applying the rule, of course you will also bear

in mind that these witnesses could have been called by the defendant if the defendant thought that their evidence would be of any material value to the defendant and it will also be for you to consider whether you think that the failure to call the other officer was because of the fear that his testimony would not have supported the Government's case or whether it would have been merely superfluous or cumulative or repetition.

"Those are all matters for you to consider in weighing the evidence of the case."

Appellant took no exception to this charge by the court.

The appellant complains that the first paragraph of the court's charge was unfavorable to him in that it permitted the jury, *"if it sees fit"*, (emphasis ours), to draw the inference that the testimony of Agent Good would not support the Government's case. He maintains, that the proper circumstances obtaining, the correct rule of law is that the presumption is mandatory and not permissive, citing "The rule, even in criminal cases, is that, if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021; Harry v. Safeway Stores, Inc., D.C., 215 F.Supp. 324, 326. The further contention of the appellant is that the proper circumstances here obtained for the creation of the presumption, to wit, that if Agent Good had been called, his testimony would have been adverse to the Government, as to that portion of Agent Shishido's testimony, and also that the presumption operated in his favor and, while the jury may or may not have believed it—in their consideration of the case—he was entitled to have them weigh it in the balance so far as it might contradict Shishido's testimony. However, this is a fine distinction to be drawn and

it may well be that the reference to the jury's discretion in the court's charge to draw the inference, "if it sees fit" was to decide whether the proper circumstances obtained for the creation of the presumption.

■ However, if the appellant wished to correct this portion of the court's charge and put the same in the light which he now alleges as error, he should have called it, as indicated heretofore, to the court's attention by proper objection and, not having done so, he has waived it.

The second paragraph of this portion of the court's charge, he alleges, was unfavorable to him because it conveyed the impression that the agent who was not called was equally available to the appellant as a witness when, in fact, he was not. United States v. Jackson, 275 F.2d 41 (C.A.3, 1958). Here, again, the appellant did not make known to the trial court his objection, as he was required to do by Rule 51 of the Criminal Rules, to that portion of the charge and, therefore, his complaint now comes too late.

■ For a proper understanding of the appellant's complaint based on the alleged mistaken identification of one Frank Ferrainolo by Larkin, some background must be given. Armed with "John Doe" warrants containing identifying descriptions of unnamed persons, Agents Shishido and Good arrested the appellant on May 4, 1963, at his place of business and Ferrainolo at a parking lot nearby. Both the appellant and Ferrainolo were brought before a United States Commissioner on the same day, but at different times, and given a preliminary hearing. What transpired at the hearing given Ferrainolo is not divulged in the record before us other than a document introduced by the appellant, marked Exhibit "D", which was a record of the United States Commissioner, of the proceedings in the case against Ferrainolo, showing he was identified, had given his name and was released after posting a $1,000 bond. The record, however, discloses that Larkin told Agent Porter, who accompanied Ferrainolo to

the Commissioner's office, having seen Ferrainolo in the hallway, that Ferrainolo was not the proper defendant and that he had the wrong man and that he did not identify Ferrainolo and did not know who did. Later on, the United States Attorney, admitting that Ferrainolo was not the John Doe described in the warrant of arrest, on June 27, 1963, secured his discharge by virtue of an order from the trial judge presiding at appellant's trial authorizing the Commissioner to dismiss the complaint filed against him.

At the trial, which began on October 2, 1963, the appellant put into evidence a page of the record of the Clerk of the Court for the Western District of Pennsylvania, heretofore adverted to as Exhibit "D", concerning the Ferrainolo proceedings before the Commissioner. A notation on this page stated:

"Proceedings taken 5/4/63 Defendant identified as accused, arraigned, and advised of rights, requested hearing and posted bond in the amount of $1,000.00. The complaint is dismissed for the reason that the defendant is not the John Doe described in the complaint."

Relying on his supposition that Larkin was the one who, at first, identified Ferrainolo at this preliminary hearing on May 4, 1963, as the person with whom he had played wagers, and then later admitted that he was not such a person, appellant's counsel acknowledged to the jury that if Larkin was mistaken in identifying Ferrainolo, then he was mistaken in identifying appellant. However, appellant never offered any proof as to Larkin's identification of Ferrainolo at this hearing. The fact is, and the record discloses, that Larkin denied that he did so do and stated, further, that he did not know who identified Ferrainolo. The record, therefore, gave no warrant for

any assertion, even by inference, that there was any contradiction of Larkin's testimony. The appellant's contention here is that the trial court's charge misled the jury into believing that a mistaken identification did not exist. The charge of the court on this phase of the case is without error since the allegation of mistaken identification brought into the case by the appellant is an illusion which did not exist.

■ The appellant further complains of the prosecuting attorney's reading of the last sentence in Exhibit "D" which states that the complaint was dismissed against Ferrainolo on May 4, 1963, when, in fact he knew that Ferrainolo was not discharged until June 19, 1963. The prosecuting attorney did this by reason of the fact that appellant's counsel, in his previous summation, had read only the first sentence of the exhibit concerning Ferrainolo's identification and stated, referring to Larkin, "This is this man, that on May 4th, their own records show that he identified the wrong man and that it took them until June to get him discharged." This statement by the appellant's counsel had no foundation in fact whatsoever and, while the prosecuting attorney's comment was incorrect, it had some little foundation in fact since Exhibit "D" was part of the record introduced by the appellant and he cannot now be heard to complain that the prosecuting attorney's advertence to it was harmful since the document could not, within reason, serve the purpose for which the appellant introduced it into evidence.

Finally, the appellant contends that the evidence falls far short of advising the sentencing court of all the essential facts, whether he was a numbers "writer" or a numbers "banker" so it could constitutionally exercise its discretion in imposing sentence.[7] By this he seems to imply that the "writer" because of his viola-

7. The court could have imposed a fine up to $10,000, and a prison sentence up to one year, or both, under § 7203 of the 1954 Code upon appellant on count one of the information. The penalty of $50 under § 7272 is mandatory on the second count. On the third count it could have fined appellant from $1,000 to $5,000, pursuant to § 7262. He was actually fined $2,000 plus costs of prosecution on the first count, $50 on the second count and $2,000 on the third count.

tion of the law on a lesser scale than a "banker", should be given a lighter fine than a "banker" should receive, and there is a possibility that the sentencing court treated him throughout as a "banker" when it imposed fines upon him.

The Judge who imposed the fines presided at the trial and it is not to be assumed that he was unaware of what the evidence disclosed. While he could have fined the appellant a total of $15,000 and given him a year in jail, he imposed a fine of $4,000 plus costs of prosecution, $2,000 on counts one and three and $50 on count two and it is submitted that the court was acting within its discretion in so doing. The remaining errors assigned are without merit.

Accordingly, the judgment of conviction and sentence will be affirmed.