UNITED STATES of America, Appellee,

v.

Alfredo WRIGHT–BARKER,
Appellant in 84–5845.

Appeal of Holger CASTILLO,
in 84–5846.

Appeal of Buenventura
GARCIA–SANMIGUEL,
in 84–5847.

Appeal of Alvaro
MANOSALVA–GOMEZ,
in 84–5848.

Appeal of Philip Dennison
CHIN, in 84–5849.

Appeal of Hernando Jose THOMAS–ESCOBAR, in 84–5850.

Appeal of Jose
VALENCINO–ORTIZ, in 84–5851.

Appeal of Robinson A.
ROSADO–VIZCAINO,
in 84–5852.

Appeal of Basilio
IGUALA–IGUALA, in 84–5853.

Appeal of Rafael Enrique
SAMPAYO–VEGA, in
84–5854.

Appeal of Elgaro Alberto
FLOREZ–DOMINGUEZ,
in 84–5855.

Nos. 84–5845, 84–5846, 84–5847, 84–5848, 84–5849, 84–5850, 84–5851, 84–5852, 84–5853, 84–5854 and 84–5855.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule 12(6)
Jan. 6, 1986.

Decided Feb. 14, 1986.

W. Hunt Dumont, U.S. Atty., Newark, N.J., for appellee; Donald J. Fay, Chief, Appeals Div., on brief.

John J. Hughes, Asst. Federal Public Defender for the D. of N.J., Camden, N.J., for appellant in No. 84–5845.

McLemore and McElroy, Trenton, N.J., for appellant in No. 84–5846; Paul D. McLemore, on brief.

James R. Murphy, CJA Court Approved Counsel, Trenton, N.J., for appellant in No. 84–5847.

Paul T. Koenig, Jr., Pennington, N.J., for appellant in No. 84–5848.

Lynne F. Stewart, Hoboken, N.J., for appellant in No. 84–5849.

Harry G. Parkin, Lawrenceville, N.J., for appellant in No. 84–5850.

Robert DeGeorge, Paglione, Massi & DeGeorge, Trenton, N.J., for appellant in No. 84–5851.

Jeffrey P. Blumstein, Szaferman, Lakind, Blumstein, Watter & Blader, Lawrenceville, N.J., for appellant in No. 84–5852.

Kevin M. Shanahan, Hartsough, Shanahan & Innes, Princeton, N.J., for appellant in No. 84–5853.

David L. Rhoads, of counsel and on brief, Lawrenceville, N.J., for appellant in No. 84–5854.

Robert J. Haney, Moran & Haney, Lawrenceville, N.J., for appellant in No. 84–5855.

Before ADAMS, SLOVITER and MANSMANN Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

On May 1, 1984, the United States Coast Guard cutter Active stopped and boarded the Ida II, a coastal freighter of Panamanian registry. The incident occurred in the North Atlantic, approximately 200 miles east of the New Jersey coast. A search of

the Ida II uncovered over 23 tons of marijuana, carefully secreted in the cargo hold. The ship's captain and ten crew members, citizens of countries other than the United States, were placed under arrest, indicted, and subsequently convicted of three counts of narcotics offenses.

Similar events confront law enforcement officials with some frequency, and therefore this case raises important questions concerning the jurisdiction of the United States courts to enforce federal narcotics laws on the high seas, and the evidence required to prove knowing and intentional violation of these laws by crew members on vessels employed in drug smuggling operations. In addition, the defendants raise several objections to rulings made at their trial. Based on a careful review of these issues, we will affirm.

## I.

An evaluation of federal court subject matter jurisdiction in this case requires a detailed analysis of the three counts for which defendants were convicted. All eleven defendants were charged with conspiracy to import over 23 tons of marijuana into the United States, contrary to 21 U.S.C. §§ 952(a), 960(a)(1) (1982), and in violation of § 963 (count I); possession of marijuana with intent unlawfully to import it into the United States, in violation of 21 U.S.C. §§ 955a(d)(1), 960(a)(2), and 18

U.S.C. § 2 (1982) (count II); and possession of marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(6), and 18 U.S.C. § 2 (count III).[1]

 The acts at issue occurred on the high seas, over which no nation may assert territorial jurisdiction.[2] However, Congress may assert extraterritorial jurisdiction over violations of United States law occurring on the high seas, so long as such jurisdiction does not abridge constitutional provisions or this nation's international agreements.[3]

 Congress' intent to afford extraterritorial application to the crimes charged in count II is clear. The substantive provision, 21 U.S.C. § 955a(d), states: "It is unlawful for any person to possess, manufacture, or distribute a controlled substance (1) intending that it be unlawfully imported into the United States...." This statute was enacted as part of the Marijuana on the High Seas Act of 1980, and includes an unequivocal provision for extraterritorial jurisdiction. Section 955a(h) provides: "This section is intended to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States."

In contrast, the criminal provisions cited in counts I and III, concerning conspiracy to import contraband and possession of contraband with intent to distribute,[4] do

---

1. All defendants were sentenced to five years in custody on the conspiracy count. Wright-Barker and Chin received five years on the possession counts, to run consecutively to the conspiracy sentence; Valencino-Ortiz, Rosado-Vizcaino, and Florez-Dominguez received three years on the possession counts, to run consecutively to the five-year conspiracy sentence; Castillo, Garcia-Sanmiguel, Manosalva-Gomez, Thomas-Escobar, Iguala-Iguala, and Sampayo-Vega received five years on the possession counts, to run concurrently with the conspiracy term.

2. "The high seas lie seaward of a nation's territorial sea, which is the band of water that extends up to three miles out from the coast. No nation may assert sovereignty over the high seas." *United States v. Romero-Galue,* 757 F.2d 1147, 1149 n. 1 (11th Cir.1985).

3. Coast Guard power to board, search, seize, and make arrests on vessels on the high seas

also turns on whether American laws apply there, since its statutory authority is limited to "the prevention, detection, and suppression of violations of laws of the United States." 14 U.S.C. § 89(a) (1982).

4. Count I rests primarily on §§ 952(a) and 963. Section 952(a) provides, with exceptions not relevant in this case:

· It shall be unlawful ... to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter....

Section 963 states:

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the

not, on their face, indicate that they are to be given extraterritorial application. This does not end our inquiry, however. As the Supreme Court explained in *United States v. Bowman*, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922):

> Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement and frauds of all kinds, which affect the peace and good order of the community, must of course be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard....
>
> But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents. Some such offenses can only be committed within the territorial jurisdiction of the government because of the local acts required to constitute them. Others are such that to limit their *locus* to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas

and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the *locus* shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

*Id.* at 98, 43 S.Ct. at 41. The statutes at issue here fall into the second category described in *Bowman*. Congress undoubtedly intended to prohibit conspiracies to import controlled substances into the United States, and intentions to distribute such contraband there, as part of its continuing effort to contain the evils caused on American soil by foreign as well as domestic suppliers of illegal narcotics. Application of these laws to smugglers on the high seas is necessary to accomplish this purpose, such that extraterritorial application may be readily implied. To deny such use of the criminal provisions "would be greatly to curtail the scope and usefulness of the statute[s]."

▮ Accordingly, we conclude that the narcotics statutes cited in the complaint were intended to have extraterritorial application. That, however, does not necessarily mean that jurisdiction is present *in this case*. A further hurdle is the traditional requirement of international law that a state apply criminal jurisdiction to acts committed outside its territorial borders only where an effect occurs within those borders. *Strassheim v. Daily*, 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911); Restatement (Second) of the Foreign Relations Law of the United States § 18 (1965).[5] Federal courts will not im-

---

commission of which was the object of the attempt or conspiracy.

Count III alleges a violation of 21 U.S.C. § 841(a)(1):

> (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
>
> (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance....

**5.** International law generally recognizes five theories of criminal jurisdiction: 1) territorial—within the state's territorial borders; 2) nationality—as applied to nationals, wherever located;

3) passive personality—as applied to those who commit crimes against nationals, wherever located; 4) protective—applied to acts that have a potentially adverse effect on the state's security and governmental interests, wherever committed; and 5) universal—applied by any state to acts, wherever committed, regarded as heinous crimes. *See generally Harvard Research in International Law, Jurisdiction with Respect to Crime*, 29 Am.J.Int'l.L. 474 (1935). The Restatement does not recognize the third theory. *See* § 30(2).

The jurisdiction discussed in the text above, permitting application of laws to acts commit-

pute to Congress an intent to disregard such "limitations customarily observed by nations upon the exercise of their powers...." *United States v. Aluminum Co. of America*, 148 F.2d 416, 443 (2d Cir.1945) (certification from Supreme Court for lack of quorum).

Recently, American commentators have noted a change in the traditional rule, arguing that international law permits jurisdiction even where an effect is intended but not accomplished in the forum state's territory. Most significantly, the revised draft of the Restatement recognizes this new doctrine. Restatement (Revised) of the Foreign Relations Law of the United States § 402 (Tent. Draft No. 6, 1985). A comment provides:

> Cases involving only intended but not realized effect are rare, but international law does not preclude jurisdiction on this basis, subject to the principle of reasonableness. When the intent of the person sought to be charged is clear and the effect to be produced by the challenged activity is substantial and foreseeable, the fact that an act or conspiracy was thwarted before its effect was felt does not deprive the target state of jurisdiction to make its law applicable to that activity.

*Id.* at § 402 comment d.

To assess which assertions of jurisdiction are reasonable, the draft directs that all circumstances be considered, including the foreseeability of the effect, the importance of regulation to the regulating state, and the likelihood of conflict with regulation by other states. Here, importation and distribution of over 23 tons of marijuana would clearly have a harmful effect and merit federal law enforcement attention. Further, other nations are unlikely to have a desire to regulate smuggling in the area of the North Atlantic where the Ida II was located. Therefore, Congress' intent to ap-

ply the enumerated statutes extraterritorially is, under the facts of this case, reasonable.

The drug smuggling context reveals the wisdom of the approach taken by the revision to the Restatement. All the crimes charged here do not require proof of an action within the United States. A conspiracy to import may be established without proof of an overt act in the United States, *see, e.g., United States v. Bey*, 736 F.2d 891, 894 (3d Cir.1984) (construing identical language of 21 U.S.C. § 846 (1982)); *United States v. Marable*, 578 F.2d 151, 153–54 (5th Cir.1978) (construing § 963); sections 955a(d)(1) and 955a(h) refer explicitly to acts of possession with intent to import committed outside the United States; and section 841(a)(1) also imposes no locational requirement. The purpose of these provisions is to halt smugglers *before* they introduce their dangerous wares into and distribute them in this country. A jurisdictional requirement that an effect occur in the United States contravenes this purpose, and need not be imposed in a case such as this, so long as it is proven that an effect in the United States was intended, and no interests of comity are affected. *See, e.g., United States v. Ricardo*, 619 F.2d 1124, 1128–29 (5th Cir.) (§ 963), *cert. denied*, 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980); *United States v. Loalza-Vasquez*, 735 F.2d 153, 156 (5th Cir.1984) (§§ 952(A), 963)); *United States v. Orozco-Prada*, 732 F.2d 1076, 1087–88 (2d Cir.) (§ 841(a)(1)), *cert. denied*, —— U.S. ——, 105 S.Ct. 154, 155, 83 L.Ed.2d 92 (1984); *United States v. Arra*, 630 F.2d 836, 840 (1st Cir.1980) (same); *United States v. Baker*, 609 F.2d 134, 137–39 (5th Cir.1980) (same).

In short, Congress intended the statutes to have extraterritorial application to the crimes charged. Further, international law permits such jurisdiction over every count

ted elsewhere that cause an effect within the forum state's territory, is commonly referred to as the "objective territoriality" aspect of the territorial theory. Arguably, the protective and universal theories may also apply here. But international agreements have yet to recognize

drug smuggling as a threat to a nation's "security as a state or the operation of its governmental functions," warranting protective jurisdiction, Restatement § 33, or as a heinous crime subject to universal jurisdiction.

in this case if intended effects in the United States, and not actual effects, are proven.

■ The district court determined that such proof existed. It concluded that, assuming the defendants participated in the conspiracy and intended to import marijuana and distribute it in some country, the goal of these efforts was to bring the marijuana to the United States and distribute it. In this respect, the district court relied primarily on the testimony of Lt. Jeffrey Hammond, the officer who led the boarding party, and Coast Guard agent Gerald Brooks, a qualified expert in navigation and narcotics smuggling.[6]

Hammond testified that he stopped the Ida II because it is a coastal freighter not typically seen in the area of the North Atlantic where it was halted, approximately 200 miles east of New Jersey and 100 miles south of Nantucket Island; was riding high in the water, indicating it did not carry a full cargo; was in generally poor condition; and carried sophisticated navigation and communications equipment. All of this, he said, is characteristic of a "mothership" used to carry a large amount of marijuana to a point at sea and "offload" it to smaller vessels before the trip to shore. Hammond stated that his suspicion heightened when Captain Wright-Barker informed him by radio that the ship had departed from Barranquilla, Colombia, a port notorious as a point of embarkation for drug smugglers. Finally, Hammond stated that the ship's course indicated that it was heading for Cape Cod or the eastern tip of Long Island.

Brooks agreed with Hammond that the vessel's course and condition were typical of drug smuggling. He noted that the ship

had proceeded north along the Haitian coast, avoiding more popular shipping lanes patrolled by the Coast Guard. According to charts found on the Ida II, the vessel stopped several times in the vicinity of Jacksonville, Florida and Georgetown, South Carolina, a typical route for meeting compatriots and receiving instructions. Further, upon boarding Hammond noticed an operating Loran navigational device, but after the two-hour search of the vessel he found the device switched off and its "memory" erased. Brooks concluded that the ship was proceeding to Atlantis Canyon, a known offloading spot for traffickers of drugs destined for the United States. The vessel was halted only a few miles from Atlantis Canyon.

Defendants offered an expert in charts and navigation who testified that he believed the ship was headed for St. John's, Newfoundland.[7] Brooks disputed this, noting that charts seized after the search of the ship were unsigned and uncertified, and appeared hastily drawn; part of the purported course for Canada passed through an area with waters only 19 feet deep. Further, the defendants did not carry the foul-weather gear necessary for travel in that part of the Atlantic. Based on this testimony, the district court concluded at a preliminary hearing that it had jurisdiction.

■ The scenario described by the witnesses differs from that in *United States v. Loalza-Vasquez*, 735 F.2d 153, 155 (5th Cir.1984), where the ship was initially seen headed for the United States and then made a radical turn after being approached by the Coast Guard. Here, although it is disputable which body of land the ship was moving towards, assertion of United States

---

**6.** An expert may be qualified "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...." Fed. R.Evid. 702. Further, "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). The arcane area of smuggling by sea-going vessels falls within this rule. *United States v. Hensel,*

699 F.2d 18, 38 (1st Cir.), *cert. denied,* 464 U.S. 823, 824, 104 S.Ct. 91, 94, 78 L.Ed.2d 99, 100 (1983); *United States v. DeWeese,* 632 F.2d 1267, 1271–72 (5th Cir.1980), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981).

**7.** A bill of lading on the ship stated that delivery of cement blocks was scheduled for St. John's, but the document was not properly notarized and would have been ineffectual to transfer possession.

jurisdiction rests in essence on the testimony that the mothership appeared to be proceeding to a known offloading spot for United States smugglers. In addition, we agree with the court's observation in *United States v. Marsh*, 747 F.2d 14, 15 (1st Cir.1984), that where a smuggling vessel is found off the northeastern portion of North America a court may at least consider that a far more lucrative market is available in the nearby portion of the United States than in areas such as Nova Scotia and New Brunswick.

In our view, the district court's factual determination, and its reliance on Brooks' testimony instead of the testimony of the expert presented by the defense, is not clearly erroneous. The court found Hammond's and Brooks' testimony "highly credible," and determined that the ship's charts and the expert testimony supporting them were "highly questionable." We will not disturb these credibility assessments and factual findings. The ship was clearly smuggling marijuana and acting as a mothership; the only question is where the drugs were to be landed. Brooks' theory is reasonable, and his view that the smugglers intended to import the marijuana into the United States and distribute it there creates the link necessary to establish subject matter jurisdiction over each charge in the complaint.

## II.

A necessary element of the conspiracy and possession charges is individual intent to join the conspiracy and individual intent to import and distribute the marijuana in the United States. Several defendants advance the argument that the government did not meet its burden of proving such intent. However, only one of the defendants properly preserved the issue of sufficiency of the evidence for presentation to this Court.

In order to raise on appeal a challenge to the sufficiency of the evidence in a criminal proceeding, a defendant must offer a timely motion for acquittal before the district court. All defendants made such motions at the close of the government's case, but then presented a defense, thereby waiving their motions for acquittal, at least in the absence of a motion after all the evidence was submitted. *United States v. Manos*, 340 F.2d 534, 536 (3d Cir.1965); *see also United States v. Trotter*, 529 F.2d 806, 809 n. 3 (3d Cir.1976). None of the defendants renewed his motion after the close of all of the evidence in order to preserve the sufficiency issue for appellate review under the substantial evidence standard recently reaffirmed in *Government of the Virgin Islands v. Williams*, 739 F.2d 936, 940 (3d Cir.1984) (whether there is substantial evidence when viewed in the light most favorable to the government to support a jury's finding of guilt beyond a reasonable doubt). Rather, every defendant except Manosalva-Gomez renewed his motion for acquittal *following* the verdict, but only Wright-Barker did so within the seven-day period provided for such a motion in Fed.R.Crim.P. 29(c). The time limit imposed on defendants by Rule 29 is mandatory, and the district court therefore did not err in refusing to consider the motion of every defendant but Wright-Barker. *United States v. Giampa*, 758 F.2d 928, 936 n. 1 (3d Cir.1985).[8] As these ten defendants did not properly preserve before the district court the issue of evidentiary sufficiency of their convictions, either by renewing the motion for judgment of acquittal at the close of the evidence or by filing a timely post-verdict motion, *Manos* dictates that this Court may review that matter only for plain error. 340 F.2d at 537; *see also United States v. Dickens*, 695 F.2d 765, 781 (3d Cir.1982), *cert. de-*

---

**8.** *Giampa* held that even if a defendant fails to bring a timely motion under Rule 29(c), the district court retains "inherent power" to enter a judgment of acquittal. 758 F.2d at 936 n. 1.

Here, aside from the fact that none of the defendants raised this point, the district court chose not to exercise its power, and we therefore need not examine the limit of its authority.

*nied,* 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983).[9]

Indeed, Garcia-Sanmiguel, Chin, Iguala-Iguala, Florez-Dominguez, and Sampayo-Vega[10] do not argue the sufficiency of evidence point on appeal. Castillo, Manosalva-Gomez, Thomas-Escobar, Valencino-Ortiz, and Rosado-Vizcaino raise the issue, but offer no explanation of their untimely motions for acquittal.

Turning to the substantive question, the most important facts concern the location of the marijuana on the ship. After a lengthy search, the Coast Guard boarding party found the drugs, stacked in 60–70 pound bales, behind two false walls in the cargo hold. The marijuana was difficult to locate, and its odor could not be detected in the common areas of the ship. An acetylene torch was needed to cut through the false walls. The odor was detected first in the forepeak tank, in the forward area of the cargo hold. The open area of the hold, where no marijuana was found, contained three layers of cement blocks.

Defendants argue that they were not aware of the marijuana, and should not be convicted merely because of their presence on a ship transporting illegal drugs. In reviewing a jury's verdict, we look for substantial evidence, viewed in the light most favorable to the government, to support the jury's conclusion. The evidence need not be inconsistent with every conclusion save that of guilt. *United States v. Leon,* 739 F.2d 885, 890–91 (3d Cir.1984).

■ Wright-Barker, the only defendant who properly raised the issue of sufficiency of the evidence, has the weakest argument. He had been indicted earlier following an arrest on a similar vessel employed in the smuggling trade, suggesting knowledge of the purpose of the Ida II's voyage. Further, other courts have held, quite sensibly, that a captain is likely to know the contents of his ship. *See, e.g., United States v.*

*Guerrero-Guerrero,* 776 F.2d 1071, 1074 (1st Cir.1985). A jury could reasonably conclude that Wright-Barker participated in the crimes of conspiracy to import marijuana, and possession with intent to import and distribute.

■ The evidence of guilt of the crew members presents a closer question, although the standard for evaluating their appeal on this point is a far stricter one. As stated earlier, because the district court was not given an opportunity to address the motions by these defendants on a timely basis, the sufficiency of the evidence supporting their convictions may be reviewed only for plain error. Such a determination requires that the mistake "be so clear that 'the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it.'" *United States v. Castro,* 776 F.2d 1118, 1129 (3d Cir.1985) (quoting *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)).

■ Chin, the navigator, cannot meet this test. It reasonably may be assumed that he was aware of the suspicious course described by agent Brooks, and therefore knew of the drug smuggling activity. Further, he had been convicted only months before for participation in smuggling at sea, and thus there is more than sufficient evidence of his knowledge and intent on which the jury could act.

This leaves the other crew members who played less important roles aboard the freighter. For example, Castillo testified that he worked on the ship as an oiler, and did not have reason to enter the cargo hold. He took the job because he was unemployed, he said, and it was his first ocean voyage. Manosalva-Gomez testified that he was the ship's cook. No evidence concerning these or any of the other individual

9. As an alternative to their motions for judgment of acquittal, nine defendants other than Wright-Barker and Manosalva-Gomez moved for a new trial. These motions were also untimely, Fed.R.Crim.P. 33, and more importantly such motions are an inappropriate means of raising a challenge to the sufficiency of the evidence, *Manos,* 340 F.2d at 537.

10. Sampayo-Vega's brief states that he adopts the arguments of his co-defendants, but he does not specify to which issues he is referring.

crew members was introduced except that they were on board when the ship was stopped; in addition, there was evidence of a similar prior act by crew member Rosado-Vizcaino.

Nevertheless, circumstantial evidence supports the jury's verdict as to them. The crew of eleven was large for the coastal freighter; its size suggests that they loaded and planned to offload the huge narcotics cache. In addition, the defendants who testified stated that they sailed from Barranquilla on April 14 and set out to sea, and a departure certificate from that port corroborated this date. Brooks, relying on charts found on the Ida II, stated his opinion that the vessel did not leave the Colombia area until April 20 or 21, and that during the delay defendants loaded the marijuana at a point on a nearby river. This evidence was corroborated, and defendants' testimony on this point was impeached by the discovery on the Ida II of a sports section from a Barranquilla daily newspaper, dated April 17.

Further, other appellate courts have affirmed convictions in a significant number of reported decisions on facts similar to those here. The Fifth Circuit summarized: "Most frequently ... courts have found that such factors as the length of the voyage, the amount of the marijuana on board, and the necessarily close relationship of those on board ... support an inference of knowing participation by the crewmembers." *United States v. Quejada-Zurique*, 708 F.2d 857, 859 (1st Cir.), *cert. denied*, 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983); *see also United States v. Bent*, 702 F.2d 210, 214 (11th Cir.1983). Another consideration often mentioned is that "conspirators engaged in conduct which, by its very nature is kept a secret from outsiders, would reasonably not allow the presence of innocent bystanders in their midst while conducting a lengthy, illegal operation.... [T]his position ... is supported by reason and common sense, as well as the law." *United States v. Beltran*, 761 F.2d 1, 6 (1st Cir.1985).

While these courts infer knowing possession merely from the length of the voyage and the quantity of narcotics found on the ship, there was additional evidence here. There was proof that the defendants were on board the Ida II for 17 days, and that the vessel carried 23½ tons of marijuana; there is also a reasonable inference that the large crew participated in loading the contraband. In sum, the government's case is strongly indicative that all crew members knowingly participated in the conspiracy and intended to land the contraband in the United States. Taking this evidence in the light most favorable to the government, we conclude that the jury could reasonably convict the defendants on counts I and II. Surely, the convictions do not rise to the level of plain error, and do not create a miscarriage of justice so clear that "the trial judge and prosecutor were derelict" in even permitting the jury to deliberate. *See Frady, supra*, 456 U.S. at 163, 102 S.Ct. at 1592.

We reach the same conclusion concerning count III, possession with intent to distribute, but that determination merits further discussion. The ultimate goal of the illegal operation was to distribute the marijuana to others; the sheer size of the shipment permits no other rational determination. *See, e.g., United States v. Flynn*, 664 F.2d 1296, 1307 (5th Cir.), *cert. denied*, 456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982). Nevertheless, it may be argued that those who possess marijuana with intent to import it should not be held responsible for the subsequent distribution activities of others.

In an analogous situation, where an individual aboard a ship is charged with conspiracy to import and conspiracy to distribute, the weight of authority holds that conviction on the first charge permits conviction on the second so long as there is sufficient proof of a plan to distribute. *United States v. Gort*, 737 F.2d 1560, 1563–64 (11th Cir.1984); *United States v. Michelena-Orovio*, 719 F.2d 738 (5th Cir. 1983) (in banc), *cert. denied*, 465 U.S. 1104, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1984); *con-*

tra *United States v. Manbeck,* 744 F.2d 360, 390–91 (4th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985). The crime of intended distribution of marijuana delivered by sea does not commence only when the drugs reach the shore; those aboard the ship are "actual participant[s] in at least a portion of the distribution chain," *Michelena-Orovio,* 719 F.2d at 749, since their financial success is possible only because of the distribution which their activities facilitate. Consequently, where persons intend to import contraband, and intent eventually to distribute is established by the size of the cargo or some other evidence, those persons may be convicted of intended distribution as well. Such evidence was available to the jury here, and the convictions will therefore stand.

### III.

Every defendant except Sampayo-Vega [11] challenges the admission of a report prepared by Lt. Hammond following the arrests aboard the Ida II. Hammond testified that he is required by his employer, the Coast Guard, to prepare such a report immediately after each boarding. The trial judge held that the report, although hearsay, was useful as a record of the times of various events during the stop and seizure. He admitted the report pursuant to Fed.R. Evid. 803(6), the regular business records exception to the hearsay rule.

Defendants insist this ruling was erroneous under Fed.R.Evid. 803(8). That rule provides that public records are an exception to the hearsay rule, and includes "(B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel...." In *United States v. Oates,* 560 F.2d 45 (2d Cir.1977), the court stated that documents excluded by this rule may not be admitted under any other hearsay exception. *Id.* at 68.

We need not decide whether the *Oates* rule bars admission of the Hammond report, because even assuming inadmissibility any error here was harmless.[12] The report, though stating conclusions concerning the motives and impropriety of defendants' actions, was merely cumulative of both Hammond's and Brooks' testimony at trial. Both men testified and were cross-examined at length.

Defendants draw our attention to *United States v. Ware,* 247 F.2d 698 (7th Cir.1957), in which envelopes were improperly admitted on which narcotics agents had written notations concerning the circumstances of the alleged crimes. The agents testified at trial, and the evidence was cumulative, but the court nevertheless reversed the convictions. It ruled, "The jury thus had before it a neat condensation of the government's whole case against the defendant.... In these circumstances we cannot say that the error did not influence the jury, to the defendant's detriment, or had but very

---

**11.** *But see* footnote 10 *supra.*

**12.** This Court recently stated in dicta that "subdivision (B) prevents the introduction of law enforcement reports against defendants in criminal cases," *United States v. DePeri,* 778 F.2d 963, 976 (3d Cir.1985), but it has never had occasion to decide whether such reports are admissible under another hearsay exception. The Second Circuit itself has diluted the force of the *Oates* statement, ruling that a report within Rule 803(8)(B) may be admitted under Rule 803(10) (certification of absence of public record or entry). *United States v. Yakobov,* 712 F.2d 20, 26 (2d Cir.1983).

Other courts have held that law enforcement reports may be admitted under the business records exception, Rule 803(6), so long as the author is available to testify at trial. *Chaney v. Brown,* 730 F.2d 1334, 1354 n. 26 (10th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 601, 83 L.Ed.2d 710 (1984); *United States v. Sawyer,* 607 F.2d 1190, 1193 (7th Cir.1979), *cert. denied,* 445 U.S. 943, 100 S.Ct. 1338, 63 L.Ed.2d 776 (1980). Some courts have also permitted introduction of law enforcement reports, despite Rule 803(8)(B), where such reports are not adversarial, but rather are "ministerial, objective, and nonevaluative." *United States v. Gilbert,* 774 F.2d 962, 965 (9th Cir.1985); *see also United States v. Coleman,* 631 F.2d 908, 912 (D.C.Cir. 1980). Given our resolution of this appeal, we need not decide whether such exceptions are appropriate or applicable.

slight effect." *Id.* at 700–01. *See also Clark v. City of Los Angeles,* 650 F.2d 1033, 1038 (9th Cir.1981); *United States v. Quinto,* 582 F.2d 224, 235 (2d Cir.1978); *United States v. Brown,* 451 F.2d 1231, 1234 (5th Cir.1971); *Sanchez v. United States,* 293 F.2d 260, 269 (8th Cir.1961).

We agree with *United States v. Treadwell,* 760 F.2d 327, 340 (D.C.Cir.1985), that where the inadmissible evidence summarizes the testimony of only one government witness, *Ware* is distinguishable. In such a situation, the jury does not have before it a hearsay summary of the government's *whole* case, but rather one document that is cumulative of other evidence. When the author of the document also has been cross-examined, as here, we are persuaded that it is highly probable that no prejudice occurred.

### IV.

During its deliberations, the jury requested that the court read back certain testimony: "The portion of testimony where [Brooks] tracks back from each fix from point of seizure to date of departure." The court then ordered that crucial testimony to be read, in which Brooks interpreted the charts found on the ship and concluded that the vessel did not leave the Barranquilla area until April 20 or 21. All defendants insist that the court erred in refusing their request to read, in addition, from Brooks' cross-examination. They argue that that testimony, concerning vessel speed and direction, cast doubt upon Brooks' ability to determine the date of departure.

In *United States v. Zarintash,* 736 F.2d 66 (3d Cir.1984), we held that a trial judge had broad discretion in determining whether to accede to a jury's request for reading of testimony. "But this discretion is based on a limited, two-fold rationale: first, that requests to read testimony may slow the trial where the requested testimony is lengthy; second, that reading only a portion of the testimony may cause the jury to give that portion undue emphasis." *Id.* at 69–70. The Court decided that the trial

judge had abused his discretion in refusing to read 20 pages of testimony that was crucial to the guilt determination, and ordered a new trial. *Id.* at 71.

■■■ There was no similar error here. The jury requested specific testimony, and it was read. Additional testimony cited by defendants may have been only 4–5 pages long, but it was not within the jury's description. The trial judge did not abuse his discretion in refusing to read it, and acted properly in assuring the jury that if it wished to hear more it need only ask. The jury did not request any additional testimony.

### V.

A number of defendants raise issues concerning the government's use of evidence of prior acts. Such evidence was admitted against Wright-Barker, Rosado-Vizcaino, and Chin, to prove knowledge and intent. Fed.R.Evid. 404(b). These defendants argue that the prior circumstances were too dissimilar, that the prejudice accordingly outweighed any probative relevance, and that the trial judge therefore erred in allowing the evidence.

Wright-Barker was a crew member on a fishing vessel stopped near Puerto Rico in 1983. Marijuana was found in a hidden compartment of the bulkhead of the fishing vessel. Wright-Barker notes that this was a different type of vessel than the Ida II, and that it was stopped in a different region. Further, he was merely indicted and deported, but not convicted. Rosado-Vizcaino was also indicted and deported following his arrest on a small vessel off the Florida coast in early 1984; marijuana was found beneath the crew's quarters, wrapped in bales similar to those seized on the Ida II. Chin was convicted for his participation in the attempted smuggling of marijuana in early 1984 in a fishing vessel off the Florida coast. That journey had also begun in Barranquilla.

■■■ Defendants are correct that there are dissimilarities between the earlier cases and the arrests at issue here. It is possi-

ble, especially in the case of Rosado-Vizcaino, a crew member with no previous conviction, that they were simply found twice in the wrong place at the wrong time. Nevertheless, the proximity in time of all of these events strongly suggests otherwise, and the prior acts are sufficiently probative to justify the district court's ruling. *See United States v. Weiler*, 385 F.2d 63, 68 (3d Cir.1967) (act committed 14 months earlier was not too remote in time to eliminate district court's sound discretion as to admissibility).

▬ The defendants also argue that the trial judge erred in refusing to hold a pretrial evidentiary hearing on the admissibility of evidence concerning prior acts, and waiting until after the jury was empanelled to do so. However, the failure to hold a preliminary hearing in this situation is not reversible error in view of our determination that the evidence was properly admitted. *See United States v. Benton*, 637 F.2d 1052, 1056 (5th Cir.1981).

Another issue concerns the trial court's suggestion, before trial began, that evidence of prior acts would be admissible against Florez-Dominguez and Valencino-Ortiz, as well as the other three defendants. Later, the judge changed his position, but not before the prosecutor—as well as Florez-Dominguez's counsel—referred to these facts in their opening statements. Following the judge's second ruling, Florez-Dominguez and Valencino-Ortiz moved unsuccessfully for a mistrial.

▬ A district court's denial of a mistrial is reviewed for abuse of discretion, and the inquiry focuses primarily on prejudice to the defendant. *United States v. DeRosa*, 548 F.2d 464, 473 (3d Cir.1977). If an opening statement is an objective summary of evidence the government reasonably expects to produce, a subsequent failure in proof will not necessarily result in a mistrial. *United States v. Somers*, 496 F.2d 723, 738–39 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). Here, the prosecutor merely said that the two defendants were "involved in similar incidents within the last two and a half

years on vessels that contained large amounts of contraband." Neither defendant objected during the government's opening; and neither requested any curative instruction. These facts, the Court held in *DeRosa*, are "a strong indication that they did not sense prejudice." 548 F.2d at 471. In these circumstances, we conclude it is highly probable that no prejudice occurred. *See also United States v. Woods*, 613 F.2d 629, 634–35 (6th Cir.), *cert. denied*, 446 U.S. 920, 100 S.Ct. 1856, 64 L.Ed.2d 275 (1980); *Grimaldi v. United States*, 606 F.2d 332, 340 (1st Cir.), *cert. denied*, 444 U.S. 971, 100 S.Ct. 465, 62 L.Ed.2d 386 (1979).

Six defendants against whom no evidence of prior acts was offered moved unsuccessfully for severance. Now, Castillo, Thomas-Escobar and Iguala-Iguala contend that the introduction of evidence of prior acts by three defendants had a prejudicial "spillover" effect in their cases.

▬ A motion for severance is addressed to the discretion of the district court, *United States v. Boyd*, 595 F.2d 120, 125 (3d Cir.1978), and a defendant has a "heavy burden" to show abuse of discretion; "he must demonstrate clear and substantial prejudice resulting in a manifestly unfair trial." *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir.1981). "[T]he primary consideration is whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants...." *United States v. DeLarosa*, 450 F.2d 1057, 1065 (3d Cir.1971), *cert. denied*, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972). Here, as the government argues, the evidence was "easily compartmentalized." Further, the judge cautioned the jury, both at the time the evidence was introduced and in his instructions, that it could be considered only against the three defendants. The district court did not abuse its discretion in this regard.

## VI.

Finally, Sampayo-Vega and Thomas-Escobar insist that the marijuana was seized

in an illegal search and therefore testimony concerning it was improperly introduced.[13]

The leading case on the Coast Guard's authority to stop, board, and search a foreign flag vessel on the high seas is *United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980) (in banc). There, the court interpreted 14 U.S.C. § 89(a) (1982), the statute authorizing such actions, as requiring that the Coast Guard "have at least a reasonable suspicion that a vessel is subject to the operation of this country's laws before seizing the vessel." *Id.* at 1076; *see also United States v. Marsh*, 747 F.2d 7, 10 (1st Cir.1984). It relied on the 'reasonable ground for suspicion' exception to the principle of noninterference on the high seas. Art. 22, Convention on the High Seas, *opened for signature* April 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200 (entered into force Sept. 30, 1962).

 *Williams* concluded, and we agree, that a reasonable suspicion requirement for searches and seizures on the high seas survives Fourth Amendment scrutiny. *See United States v. Demanett*, 629 F.2d 862, 868 (3d Cir.1980) (where Coast Guard had reasonable and articulate cause to board ship for documentation verification inspection, Fourth Amendment requirements were satisfied), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981).[14] Further, the standard is surely met in this case. Lt. Hammond's observations, recited earlier, reasonably indicated that the Ida II was smuggling contraband and that a violation of United States law was occurring.

In addition, as the district court found, Captain Wright-Barker as well as the Panamanian government gave complete consent to the search. And a crew member such as Sampayo-Vega or Thomas-Escobar has no expectation of privacy in a ship's cargo hold, and therefore no right to challenge the legality of the search in that area. *United States v. Alvarez-Mena*, 765 F.2d 1259, 1269 (5th Cir.1985); *United States v. Pinto-Mejia*, 720 F.2d 248, 255 (2d Cir.1983).

## VII.

For the reasons discussed above, the district court's disposition of defendants' cases will be affirmed.

13. Thomas-Escobar improperly phrases his challenge to Coast Guard power to search the vessel as an attack on federal jurisdiction.

14. Indeed, an argument may be made that searches on the high seas may be conducted on even less cause than reasonable suspicion. *See United States v. Villamonte-Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983) (customs officials may board ship in United States waters to inspect documents, even if they have

no suspicion of any wrongdoing, if ship has ready access to open seas). *Williams* held that the Constitution does require reasonable suspicion in order to search private areas of the hold. 617 F.2d at 1087. Because we find that there was reasonable suspicion in this case, we need not decide whether any lesser standard is constitutionally permissible when vessels are seized and searched due to suspicion of contraband smuggling.