**UNITED STATES of America**

v.

**Andrew M. HARVEY, III, Appellant.**

**No. 92–3273.**

United States Court of Appeals, Third Circuit.

Aug. 23, 1993.

Thomas R. Ceraso (argued), Ceraso & Ta-rosky, Greensburg, PA, for appellant.

Bonnie R. Schlueter (argued), Paul J. Brysh, Office of U.S. Atty., Pittsburgh, PA, for appellee.

Argued Dec. 8, 1992.

Before: SCIRICA, ALITO and HIGGINBOTHAM *, Circuit Judges.

Reargued May 20, 1993.

Before: BECKER, SCIRICA and ALITO, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

Andrew Harvey entered a conditional plea of guilty to one count of possession of child pornography in violation of § 2252(a)(4)(B) of The Protection of Children from Sexual Exploitation Act, as amended, 18 U.S.C. § 2251–57 (1988). Under the terms of the conditional plea, Harvey preserved his right to appeal the denial of his motion to suppress evidence discovered in a search of his residence. Because we believe substantial evidence supported the issuance of the search warrant, we will affirm. Harvey also challenges his sentence on several grounds. We will vacate and remand for resentencing.[1]

---

* The Honorable A. Leon Higginbotham, Jr. retired from the Court on March 5, 1993, and took no part in this decision.

1. We have jurisdiction to review Harvey's claims under 18 U.S.C. § 3742(a) (1988) and 28 U.S.C. § 1291 (1988).

## I.

The Federal Bureau of Investigation conducted a two-year investigation of Harvey. On October 22, 1991, agent John McCarthy sought a search warrant for Harvey's residence, believing contraband child pornography was on the premises. In support of his application, McCarthy summarized his training and experience investigating child pornography and pedophilic offenses. He provided a general profile of pedophilic behavior and, specifically, of the "tendency for pedophiles to retain or rarely dispose of sexually explicit material involving children."

In the course of his investigation, McCarthy accumulated several significant items, which he described in the warrant application, including:

1) Pennsylvania State Police records that Harvey pled guilty to corrupting a minor, indecent assault, and involuntary deviate sexual intercourse with a male minor in February of 1977;

2) a letter from the Commissioner of the Philippines' Bureau of Immigration and Naturalization that Harvey had been deported in 1988 for "being a pedophile;"

3) results of a criminal investigation by the postal service that, ten times between April and July 1990 and three times in August 1991, Harvey received mailings from organizations that were either known to distribute or suspected of distributing child pornography. Four of the mailings were third-class bulk mailings.

On the basis of this information, the magistrate judge issued a warrant to search Harvey's residence for "visual depictions of naked children."

At Harvey's house, the FBI found 75 photographs of naked children engaged in sexually explicit conduct—many of which, Harvey admitted, he had taken himself. The FBI also found an assortment of advertisements and catalogues for child pornography. Along with the array of photographs and other items, the FBI discovered a file of 560 index cards. The hand-written text of each index card described, in graphic detail, Harvey's deviant sexual activities with boys—as young as ages seven and nine—while on trips to the Philippines.

Harvey moved to suppress evidence uncovered by the search. After the district court denied the motion, Harvey entered a conditional plea of guilty.

At the sentencing hearing, after initially finding a base offense level of 13, *see* U.S.S.G. § 2G2.2(a),[2] the district judge subtracted two levels for acceptance of responsibility, then added two levels because he found Harvey's offense involved prepubescent children. The judge then determined an upward departure was "required by the evidence of defendant's past criminal conduct and the likelihood that the defendant will commit other such crimes in the future." He increased Harvey's base offense level to 22 and imposed a sentence of 48 months in prison, with 3 years supervised release. The judge also required Harvey to pay the costs of incarceration and make a $5,000 donation to the Pittsburgh Coalition Against Pornography.

## II.

Harvey contends the district court should have suppressed evidence discovered in a search of his home. We disagree.

In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court defined the applicable standards for issuing and reviewing a search warrant:

[t]he task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before

---

**2.** The district court sentenced Harvey under § 2G2.2 as it existed prior to the November 27, 1991 amendments to the Guidelines. Because Harvey pled guilty on March 13, 1992, he should have been sentenced under the amended version of the Guidelines, and § 2G2.4, entitled "Possession of Materials Depicting a Minor Engaged in Sexually Explicit Conduct," was the proper guideline for Harvey's offense. The error had no impact on his sentence because § 2G2.4—like old § 2G2.2—carries a base offense level of 13 and includes a cross-reference identical to old § 2G2.2(c)(1), *see* § 2G2.4(c)(1). Therefore, we confine our discussion, where relevant, to § 2G2.4, not § 2G2.2.

him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

462 U.S. at 238–39, 103 S.Ct. at 2332–33 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), *overruled on other grounds, United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980)).

Recognizing a probable cause determination "should be paid great deference," Harvey nevertheless maintains the warrant application contained stale information, false and misleading statements, and uncorroborated hearsay.

### A.

Harvey claims "[t]he time periods set forth with regard to the information cited in the affidavit, even if believable, w[ere] so dissipated by the time the warrant was finally issued that probable cause no longer existed." Delivery of suspect materials to Harvey's residence occurred between two and fifteen months before execution of the search warrant. Therefore, according to Harvey, the warrant application's information was stale. We disagree.

■ Age of the information supporting a warrant application is a factor in determining probable cause. *See United States v. Forsythe,* 560 F.2d 1127, 1132 & n. 6 (3d Cir. 1977); *see also United States v. McNeese,* 901 F.2d 585, 596 (7th Cir.1990). If too old, the information is stale, and probable cause may no longer exist. *McNeese,* 901 F.2d at 596. Age alone, however, does not determine staleness. "The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant." *United States v. Williams,* 897 F.2d 1034, 1039 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2064, 114 L.Ed.2d 469 (1991). Rather, we must also examine the

nature of the crime and the type of evidence. *See United States v. Tehfe,* 722 F.2d 1114, 1119 (3d Cir.1983), *cert. denied,* 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984); *Forsythe,* 560 F.2d at 1132; *see also United States v. McCall,* 740 F.2d 1331, 1135–36 (4th Cir.1984).

In *United States v. Rabe,* 848 F.2d 994 (9th Cir.1988), the Court of Appeals for the Ninth Circuit evaluated staleness in a child pornography case. In 1984, the U.S. Customs service seized two packages addressed to Rabe that contained child pornography. In 1986, a police investigator, under an assumed name, corresponded with Rabe and established Rabe maintained a collection of child pornography. The last correspondence took place in June 1986. Setting this forth in a warrant application in August 1986, police executed a search warrant for Rabe's residence and seized child pornography. *Id.*

Rabe argued the search warrant was improper "because the information upon which it issued was stale and thus failed to establish probable cause." *Id.* The court disagreed and held the correspondence, even though exchanged two months before the search, established probable cause there was child pornography at Rabe's residence. *Id.* at 997.

The United States District Court for the District of Vermont affirmed the issuance of a search warrant in similar circumstances. *United States v. Rakowski,* 714 F.Supp. 1324, 1330–31 (D.Vt.1987). Rakowski established a post office box and received two mailings from organizations known to distribute child pornography. The mailings occurred one month and six months before the issuance of the warrant. The court found probable cause because "[t]he affidavit described a continuing offense of receiving child pornography and the enduring utility of that material to their holder." *Id.* at 1331; *see also United States v. Koelling,* 992 F.2d 817, 819–20, 23 (8th Cir.1993) (warrant containing statement that "pedophiles ... keep these materials [child pornography] for many months and years, and rarely, if ever, dispose of their collections" upheld); *Rabe,* 848 F.2d at 996 (expert affirmed in warrant application that "[a] pedophile maintains a collection of child pornography gathered over many

years and does not destroy or discard his materials"). The court found a "substantial basis for concluding that the defendant set up the box to receive one genre of mail under a fictitious name." *Id.*

■ We agree with this reasoning and, accordingly, we believe the information in the warrant application here was not stale. Agent McCarthy stated Harvey established a post office box under the name of "Harvey Andrews," and received the mailings under this and other assumed names. Harvey had received thirteen mailings from organizations known to distribute, or suspected of distributing, child pornography. Although ten mailings occurred thirteen to fifteen months prior to issuing the warrant, three occurred only two months before. McCarthy stated that, in his experience, "[p]edophiles rarely, if ever, dispose of sexually explicit material." Moreover, McCarthy provided ample information that Harvey was a pedophile. *See United States v. Weber,* 923 F.2d 1338, 1345 (9th Cir.1990) (warrant application must establish that pedophiles retain child pornography and that defendant is a pedophile). We agree there was a reasonable probability the several mailings from child pornographers would be at Harvey's residence at the time of the search. *See Rabe,* 848 F.2d at 997; *Rakowski,* 714 F.Supp. at 1331; *see also United States v. Peden,* 891 F.2d 514, 518–19 (5th Cir.1989) (based on two-year-old delivery from suspected child pornographers, expert's affirmation that pedophiles retain pornography, and eight-year-old conviction for solicitation of a minor, magistrate judge could properly conclude that child pornography would be on premises when warrant executed).

**B.**

Harvey also contends the warrant application contained false and misleading information. In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held a defendant may attack the issuance of a warrant if based on untruthful information. *Id.* at 171, 98 S.Ct. at 2684. In requiring a truthful basis for the issuance of a warrant, the Court explained

[t]his does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily.

*Id.* at 165, 98 S.Ct. at 2681. To succeed in attacking a warrant, a defendant must come forward with "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.* at 171, 98 S.Ct. at 2684.

■ Harvey claims two of the organizations from which he received mail—"Pojkart" and "NAMBLA," an acronym for "North American Man Boy Love Association"—were also engaged in nonpornographic business and this information was omitted from the affidavit. Harvey, however, offers nothing to substantiate his claim. In the warrant affidavit, McCarthy stated Pojkart was a German organization that had been investigated repeatedly by Interpol for distributing and receiving depictions of nude children. McCarthy also stated that "NAMBLA was the subject of an FBI investigation for several years in New York City [the return address of the package NAMBLA sent to Harvey] for violation of federal child pornography statutes." Harvey offers no contradictory evidence on Pojkart's or NAMBLA's activities. We find nothing misleading here. *See Franks,* 438 U.S. at 165, 98 S.Ct. at 2681.

■ Harvey also claims that McCarthy misled the magistrate judge by including the following paragraph in the warrant application:

By letter dated February 15, 1976, the [Pennsylvania State Police] ... were contacted by the Tennessee Bureau of Criminal Investigation.... The name H.M. Andrews, P.O. Box 4, Clarion, Pa 16214 appeared in the records of Boys Farm, Inc..... Tennessee authorities determined the supervisor of the "farm" "did not have a legitimate interest in the welfare of the boys and permitted and encouraged illicit and immoral act[s] to be conducted on the premises." Certain donors

were allegedly involved in these acts and Andrews' name was listed as one of the donors.

Appendix at 20.

Harvey does not argue that any statement in the paragraph is untrue, nor does he dispute that Tennessee authorities investigated the Boys Farm and its supervisor, that the authorities discovered illicit activities, that certain donors were involved in the illicit conduct, or that he was a donor. Harvey objects only that it "left a clear implication that [he] was involved in this type of conduct, which of course was not true."

We agree the paragraph contains an implication that Harvey was involved in illicit acts at the Boys Farm. However, this inference stems from facts that are, in themselves, neither false nor misleading. To succeed on his motion to suppress, *Franks* requires Harvey to produce "allegations of deliberate falsehood or of reckless disregard for the truth ... accompanied by an offer of proof." Harvey offers nothing to refute either the specific facts or their broader implication. His conclusory statement denying involvement in the activities at the Boys Farm does not satisfy the "offer of proof" requirement articulated in *Franks*—especially in light of the affidavit's other assertions that Harvey was involved in "this type of conduct." [3]

Moreover, it is apparent this information was included in the warrant only to show Harvey is a pedophile. Even if the implication is misleading, the warrant contained other reliable information from which one could reasonably conclude Harvey is a pedophile. The *Franks* Court explained "if, when material that is subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause," evidence gathered in reliance on the warrant need not be suppressed. *Id.* at 171–72, 98 S.Ct. at 2684–85; *see also United States v. Calisto*, 838 F.2d 711, 715 (3d Cir.1988) (search warrant must be upheld if, ignoring any misleading information, it was based on probable cause). We find sufficient probable cause in the warrant affidavit.

### C.

■ Harvey claims the warrant application contained unreliable hearsay because "there is nothing in the affidavit supporting the reliability of hearsay statements." The only sources of hearsay information in McCarthy's affidavit are law enforcement officers and government officials. Harvey offers nothing to question the reliability of the warrant's information. We see no reliability problem in the affidavit.

Because we conclude the warrant application did not contain stale, misleading, or unreliable information, we will affirm the district court's judgment that the warrant was validly issued.

### III.

Harvey contends his sentence is based on an improper application of Guidelines § 4A1.3. The government maintains the sentence should have been based on § 2G2.4(c)(1) rather than on § 2G2.4(a). We agree with both contentions.

■ After finding Harvey's crime warranted a base offense level of 13 under § 2G2.2(a) of the Guidelines, the district judge increased two levels under § 2G2.2(b) [4] and decreased two levels for acceptance of responsibility under § 3E1.1. The judge

---

3. We note this information may aid a magistrate judge in determining whether probable cause exists to search a residence for child pornography. *See Koelling*, 992 F.2d at 819 (warrant authorizing search of defendant's home for child pornography stated defendant "was known to have a preference for young boys").

4. Section 2G2.2(b)(1) provides a base-level increase of two levels if the defendant's conduct involved prepubescent children or children under the age of twelve. The district court increased Harvey's base offense level by two under

§ 2G2.2(b)(1) because, after reviewing all the government's evidence, it found the depictions involved such children. Harvey claims the district court erred in applying § 2G2.2(b)(1). We disagree. We believe the district court's factual finding concerning the age of the children depicted was not clear error. *See United States v. Fuentes*, 954 F.2d 151, 152–53 (3d Cir.) (district court's factual findings at sentencing hearing reviewed for clear error), *cert. denied*, — U.S. ——, 112 S.Ct. 2950, 119 L.Ed.2d 573 (1992).

then departed upward, from level 13 to 22, under § 4A1.3, finding Harvey's criminal history category did not adequately reflect the scope of his criminal activities and there was a likelihood he would commit other similar crimes in the future.[5] This departure was improper.

■ Generally, after determining the base offense level, the district judge determines the defendant's criminal history category under § 4A1.1. The criminal history categories normally account for past criminal dealings. *See United States v. Shoupe*, 988 F.2d 440, 445 (3d Cir.1993). Because the Guidelines only consider certain "prior sentences" in calculating the criminal history category (for example, concurrent sentences are not counted separately), it may not always accurately reflect the scope of the criminal's activities and the likelihood of recidivism. The Sentencing Commission addressed this concern in § 4A1.3, which provides, in part,

[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range.

U.S.S.G. § 4A1.3.

■ An upward departure under § 4A1.3, however, must be calculated by stepping up the criminal history category, not by increasing the base offense level. *See generally United States v. Hickman*, 991 F.2d 1110 (3d

Cir.1993) (in applying § 4A1.3, "the court is obliged to proceed sequentially through [the criminal history] categories"); *Shoupe*, 988 F.2d at 445 n. 7.[6] Section 4A1.3 provides that "[i]n considering a departure under this provision, the Commission intends that the court use, as a reference, the guideline range for a defendant with a higher or lower criminal history category, as applicable." [7]

As noted, Harvey's initial base offense level was 13 and his criminal history category was I. Even under a criminal history category of VI, the highest in the Sentencing Guidelines, Harvey's maximum sentence at base level 13 would have been 33 to 41 months. Instead of departing based on a higher criminal history category, the district judge adjusted Harvey's sentence upward by nine base offense levels.[8] This upward departure under § 4A1.3 was improper.

## IV.

■ Although the government concedes the upward departure under § 4A1.3 was improper, it contends the district court erred in the first instance—by refusing to compute Harvey's base offense level under U.S.S.G. § 2G2.4(c)(1). This section applies if a defendant lures a child into posing for sexually explicit photographs. If applicable, it directs the judge to sentence the defendant under § 2G2.1, which sets a base offense level 25. The district court declined to sentence Harvey under § 2G2.4(c), but we believe this was in error.[9]

---

**5.** The district judge explained:

Here defendant's criminal history category is zero, although he has two prior convictions for similar and related conduct in Clarion County, and he has, we find, engaged in the conduct depicted in the photographs, which is proscribed by federal law. We find that an upward departure is required by the evidence of defendant's past criminal conduct and the likelihood that the defendant will commit other such crimes in the future.

**6.** When appropriate, district courts may make "offense related" departures under 18 U.S.C. § 3553(b) by increasing or decreasing the base offense level of the crime. An offense-related departure is appropriate where the court finds "an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulat-

ing the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b) (1988). *See United States v. Kikumura,* 918 F.2d 1084, 1105 n. 24 (3d Cir.1990).

**7.** We have permitted a limited exception to this general rule—and allowed offense-related departures under § 4A1.3—for egregious circumstances, *e.g.,* wanton cruelty. *See United States v. Thomas,* 961 F.2d 1110, 1115 (3d Cir.1992).

**8.** Nor, as we have noted, did the district court depart based on 18 U.S.C. § 3553(b). We express no opinion on the applicability of this provision.

**9.** We have plenary review over the district court's legal conclusions with respect to the Sentencing Guidelines. *United States v. Bierley,* 922 F.2d 1061, 1064 (3d Cir.1990).

## A.

██ As an initial matter, we note the government filed no cross-appeal but instead raised § 2G2.4(c)(1)'s cross-reference as a ground for affirmance. In doing so, the government does not seek the full measure of relief under the cross-reference (i.e., a base offense level of 25) but merely asks us to affirm the base offense level of 22.

We agree no cross-appeal was necessary here. *See generally* 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure, § 3904 (1992) (advocating flexibility in cross-appeal rules). We agree with the approach taken by the Court of Appeals for the Second Circuit: "a conditional cross-appeal is not required . . . to permit us to entertain a Government request to augment one component of a sentence on one count in response to an appellate ruling decreasing another component of the sentence on the same count." *United States v. Bohn,* 959 F.2d 389, 393–94 (2d Cir.1992). Because we hold the departure under § 4A1.3 was improper, we agree the government may argue Harvey's base offense level should be augmented under § 2G2.4(c)(1). However, because the government filed no cross-appeal, it cannot obtain a sentence more favorable than that already imposed. *See* 15 Wright & Miller § 3904, at 207–08.

## B.

██ Under § 2G2.4(a) of the Guidelines, possession of child pornography ordinarily carries a base offense level of 13. Section 2G2.4(b) provides base-level increases if the pornography involved young children or if the defendant possessed ten or more books, magazines, or other items depicting the sexual exploitation of a minor. *See* U.S.S.G. § 2G2.4(b)(1), (2). After determining the offense level under subsections (a) and (b), § 2G2.4(c)(1) provides:

[i]f the offense involved *causing,* transporting, permitting, or offering or seeking by notice or advertisement, a *minor* to engage in sexually explicit conduct *for the purpose of producing a visual depiction of such conduct,* apply 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production).

(emphasis added). The cross-reference effectively imposes a base offense level of 25. *See* U.S.S.G. § 2G2.1.

By its plain terms, § 2G2.4(c)(1)'s cross-reference applies here, and a base offense level of 25 under § 2G2.1 was appropriate. Harvey took yearly trips to the Philippines to solicit and engage minors in sexually explicit conduct. Harvey admitted to police he took many of the seventy-five pictures found in his home, which showed children engaging in sexually explicit conduct. He memorialized these activities on "several hundred" index cards, some of which indicated he had taken photographs of the children in the course of sexually abusing them and paid them for it. On each card, Harvey named and described a child, indicated the particular act of sodomy, and described the position in which the activity took place. After the government introduced several of these cards into evidence, Harvey stipulated that the other cards contained similar accounts. A witness identified the children named on some of the index cards as the children depicted in the photographs. After considering the weight of the evidence, the district court concluded Harvey "engaged in the conduct depicted in the photographs." It is clear Harvey "caus[ed] . . . [or] permitt[ed] . . . a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct." Thus, § 2G2.4(c)(1) on its face clearly applies.

## C.

██ Harvey contends § 2G2.4(c)(1) does not apply because—although he made children engage in sexually explicit conduct so that he could photograph them—he did so in the Philippines not in the United States. We must decide therefore whether § 2G2.4(c)(1) applies when a defendant sexually exploits children abroad, photographs the conduct, and possesses the photographs in the United States.

**(1)**

Because § 2G2.4 implements the Protection of Children Against Sexual Exploitation Act, the Act guides our decision. If it applies to foreign conduct, the corresponding Guidelines shall as well, absent any indication to the contrary. *See* 28 U.S.C. § 994(b)(1) (the Sentencing Commission "shall" establish guidelines "consistent with all provision of title 18, United States Code").

■ Initially, we note the Act does not expressly provide for extraterritorial application. Furthermore, there is a presumption against extraterritoriality. *See Sale v. Haitian Centers Council, Inc.*, — U.S. —, —, 113 S.Ct. 2549, 2559, 125 L.Ed.2d 128 (1993) (congressional enactments presumed to apply only within United States territory); *Smith v. United States*, — U.S. —, —, 113 S.Ct. 1178, 1183, 122 L.Ed.2d 548 (1993) (same). However, in *United States v. Wright–Barker*, 784 F.2d 161 (3d Cir.1986), we recognized that a narrow category of congressional statutes apply to acts outside the United States even absent explicit statements. In these cases, " 'Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.' " *Id.* (quoting *United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922)); *see also Smith*, — U.S. at —, 113 S.Ct. at 1183 (presumption applies "unless a contrary intent appears"). In *Wright–Barker*, we held that statutes penalizing conspiracy to import a controlled substance (18 U.S.C. §§ 952(a), 963), and possession of the controlled substance with intent to distribute (21 U.S.C. § 841(a)(1)), applied to foreign conduct because:

> Congress undoubtedly intended to prohibit conspiracies to import controlled substances into the United States, and intentions to distribute such contraband there, as part of its continuing effort to contain the evils caused on American soil by for-

eign as well as domestic suppliers of illegal narcotics.

*Id.* at 167. We concluded that "to deny such use of the criminal provisions 'would be greatly to curtail the scope and usefulness of the statute[s].' " *Id.* (quoting *Bowman*, 260 U.S. at 98, 43 S.Ct. at 41).

We believe the reasons set forth in *Wright–Barker* apply to at least some of the provisions of the Protection of Children Against Sexual Exploitation Act. Congress passed the Act to "greatly enhance" the "weapons to combat child pornography and child prostitution."[10] S.Rep. No. 95–438, 95th Cong., 2d Sess. 10, *reprinted in* 1978 U.S.C.C.A.N. 40, 47. A primary motivation for expanding the anti-child-pornography laws was that "many of the sources of child pornography never came within the purview of federal investigators." *Id.* Congress believed the dissemination of child pornography "relies heavily on the use of the mails and other instrumentalities of interstate and foreign commerce." *Id.* at 6–7, *reprinted in* 1978 U.S.C.C.A.N. at 44. For this reason, Congress demanded enforcement of the Act by the Customs Service (an agency dealing exclusively with foreign commerce) and other federal agencies "be given the highest priority." It created the Act as a comprehensive scheme "to ensure that these efforts continue to receive top priority . . . ." *Id.* at 10, *reprinted in* 1978 U.S.C.C.A.N. at 47.

As in *Wright–Barker*, we find Congress enacted its statutory scheme "as part of its continuing effort to contain the evils caused on American soil by foreign as well as domestic suppliers of [child pornography]." 784 F.2d at 167. "[T]o deny [extraterritorial application of the ·Act] 'would be greatly to curtail the scope and usefulness of the statute[s].' " *Id.* (quoting *Bowman*, 260 U.S. at 98, 43 S.Ct. at 41). We can think of few more important efforts than eradicating sexual exploitation of children. *See Osborne v. Ohio*, 495 U.S. 103, 110, 110 S.Ct. 1691, 1696, 109 L.Ed.2d 98 (1990) ("[g]iven the impor-

---

10. A United Nations report details the "tourist trade" in child prostitution, estimating at least 7,000 child prostitutes "cater to foreign male tourists" in the Philippines alone. *See* Benjamin Whittaker, U.N. Comm'n Report on Human

Rights: Contemporary Manifestation of Slavery and Slave–Like Practices, *reprinted in* Interna- tional Criminal Law, vol. I, 343, 349 (1986) (ed. M. Cherif Bassiouni).

tance of the State's interest in protecting the victims of child pornography, we cannot fault Ohio for attempting to stamp out this vice at all levels of the distribution chain"); *New York v. Ferber*, 458 U.S. 747, 757, 102 S.Ct. 3348, 3354, 73 L.Ed.2d 1113 (1982) ("[t]he prevention of sexual exploitation of children and abuse of children constitutes a government objective of surpassing importance"); *see generally United States v. Knox*, 977 F.2d 815, 821–22 (3d Cir.1992), *cert. granted*, —— U.S. ——, 113 S.Ct. 2926, 124 L.Ed.2d 677 (1993). Congress recognized the importance of enacting anti-child-pornography legislation and, specifically, of the need to create a scheme that "deals directly with the abuse of children that is inherent in the production of such materials." S.Rep. No. 95–438, 95th Cong., 2d Sess. 10, *reprinted in* 1978 U.S.C.C.A.N. 40, 47.

The Court of Appeals for the Ninth Circuit took a similar view in *United States v. Thomas*, 893 F.2d 1066 (9th Cir.), *cert. denied*, 498 U.S. 826, 111 S.Ct. 80, 112 L.Ed.2d 53 (1990). Thomas was convicted for employing, persuading, or coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction in violation of 18 U.S.C. § 2251(a).[11] At trial, the government introduced photographs seized from Thomas, depicting him and a young girl engaged in sexually explicit conduct. *Id.* at 1067–68. Thomas claimed he took the pictures in Mexico and maintained § 2251(a) did not apply to extraterritorial acts. Although it recognized § 2251(a) does not apply explicitly to extraterritorial acts, the court inferred such appli-

cation " 'from the nature of the offenses and Congress' other legislative efforts to eliminate the type of crime involved.' " *Id.* at 1068 (quoting *United States v. Baker*, 609 F.2d 134, 136 (5th Cir.1980)). The court found:

> Congress has created a comprehensive statutory scheme to eradicate sexual exploitation of children.... Punishing the creation of child pornography outside the United States that is actually, is intended to be, or may reasonably be expected to be transported in interstate or foreign commerce is an important enforcement tool.

*Id.* at 1068–69 (footnote omitted). The court held "section 2251(a) applies to the acts on which Thomas' conviction ... was based, whether or not Thomas committed those acts in the United States." *Id.* at 1069.

Although Harvey was not convicted under § 2251(a), the Guidelines provision here— U.S.S.G. § 2G2.4(c)(1)—is closely analogous to it. Indeed, the purpose of § 2G2.4(c)(1) is to make the Guideline provision implementing § 2251 (§ 2G2.1) apply to § 2252 violations as well if they involve the key element of the § 2251(a) offense.[12] We see nothing to distinguish this case from *Thomas*.

### (2)

Our decision in *Wright–Barker* recognized that any exercise of extraterritorial criminal jurisdiction must comply with international law. We explained that international law permits criminal jurisdiction based on "na-

---

**11.** Section 2251(a) punishes any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person engage in, or who transports any minor in interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct....
18 U.S.C. § 2251(a).

**12.** We premise our reading of § 2G2.4(c)(1) on our view of the harm Congress sought to address by punishing possession of child pornography. Congress imposed punishment not only because of the harm to the children who were abused and photographed in the depictions for which the offender is punished, but also because of the harm these photographs will likely cause to other

children—by encouraging viewers to engage in the abusive conduct depicted. *See* S.Rep. No. 95–438, 95th Cong., 2d Sess. 5, *reprinted in* 1978 U.S.C.C.A.N. 40, 43 ("the use of children ... as the subjects of pornographic materials is very harmful to both the children and the society as a whole."); *id.* at 6, *reprinted in* 1978 U.S.C.C.A.N. at 43 ("many pedophiles ... purchase [child pornography] through mail order catalogues ... to establish contact with other pedophiles, and even to establish liasons with some of the child models."); *id.* at 6, *reprinted in* 1978 U.S.C.C.A.N. at 44 ("[t]he Committee has found a close connection between child pornography and the equally outrageous use of young children as prostitutes. The precise relationship between these two forms of child abuse, however, can take many different forms.").

tionality—as applied to nationals, wherever located." 784 F.2d at 167 n. 5 (citing Harvard Research in International Law, Jurisdiction with respect to Crime, 29 Am.J.Int'l L. 474 (1935)). The Restatement of the Foreign Relations Law of the United States embraces this same view. Section 402 of the Restatement provides "a state has jurisdiction to prescribe law with respect to ... the activities ... of its nationals outside as well as within its territory." Restatement (Third) of the Foreign Relations Law of the United States, § 402(2) (1986).

■ We hold extraterritorial application of the Act in this case does not violate international law. *See Thomas,* 893 F.2d at 1068 (application of the Act to foreign conduct of American citizen does not violate international law). Harvey, a U.S. citizen, brought illegal materials into this country. No tenet of international law prohibits Congress from punishing the wrongful conduct of its citizens, even if some of that conduct occurs abroad. *See Wright–Barker,* 784 F.2d at 167 n. 5 (international law recognizes criminal jurisdiction based on "nationality—as applied to nationals, wherever located."); *see also United States v. Reeh,* 780 F.2d 1541, 1543 n. 2 (11th Cir.1986) ("[t]he defendants are all U.S. citizens ... and a state may punish the wrongful conduct of its citizens no matter where it takes place."); *United States v. Mitchell,* 553 F.2d 996, 1001 (5th Cir.1977) ("the legislative authority of the United States over its own citizens extends to conduct by Americans on the high seas and even within the territory of other sovereigns."); *see, e.g.,* 46 U.S.C.app. § 1903(a) (proscribing drug activities aboard a vessel of the United States no matter where vessel located); 18 U.S.C. § 953 (1988) (prohibiting "[a]ny citizen of the United States, *wherever he may be,*" from corresponding with any foreign government with intent to influence its conduct) (emphasis added); *see generally* Re-

statement (Third) of the Foreign Relations Law of the United States, § 402(2).

### (3)

Relying on *United States v. Azeem,* 946 F.2d 13 (2d Cir.1991), the district judge held that application of § 2G2.4(c)(1) could not be based on foreign conduct. In *Azeem,* a jury convicted defendant of conspiring to import heroin into New York. In calculating the quantity of drugs to determine the base offense level under § 1B1.3(a)(2), the district judge included three kilograms of heroin the defendant imported into Egypt from Pakistan, in the course of the New York conspiracy. *Id.* at 15. On appeal, the court vacated defendant's sentence, holding the Egyptian quantities should have been excluded from defendant's base offense level. *Id.* at 17–18. Although recognizing the Guidelines contained no explicit preclusion, the court held that "Congress has chosen to assign foreign crimes a rather limited role" under the Guidelines. The court explained "the Guidelines ... note that foreign sentences may not be used in computing a defendant's criminal history category, but may be used for upward departures from the otherwise applicable range." *Id.* at 17 (citing § 4A1.3).

Yet, the fact that the Commission thought foreign criminal activity significant enough to possibly warrant an upward departure, under § 4A1.3, implies that foreign criminal activity may be relevant. Nevertheless, because the Commission included no "foreign conduct" limitation in § 2G2—and because we believe the Commission must have been aware the child pornography is often distributed internationally[13]—we decline to read § 4A1 as placing such a limitation on § 2G2.4(c)(1).

No other considerations lead us to circumscribe § 2G2.4(c)(1) to acts of sexual exploitation occurring within our borders. By its terms, § 2G2.4(c)(1) applies without limitation to any defendant who, having been con-

---

**13.** The Senate Committee report accompanying the Act stated

[t]he Committee also found that some child pornography available in the United States is produced in foreign countries. Indeed it is quite common for photographs or films produced in the United States to be sent to foreign countries to be reproduced and then returned

to this country in order to give the impression of foreign origin.

S.Rep. No. 95–438, 95th Cong., 2d Sess. 6, *reprinted in* 1978 U.S.C.C.A.N. at 44. The Committee also stated that child pornographers "rel[y] heavily on the use of the mails and other instrumentalities of interstate and foreign commerce." *Id.*

victed of possessing child pornography, caused or solicited a minor to engage in sexually explicit conduct in order to produce the pornographic depiction. Therefore, if a U.S. citizen, having been convicted under 18 U.S.C. § 2252 for possession of child pornography in the United States, lured a child into sexually explicit activity in order to produce the pornography, the cross reference applies regardless of where the defendant's conduct occurred.

## V.

To summarize, we find Harvey's sentence is based on two errors under the Sentencing Guidelines—an improper departure under § 4A1.3 and a failure to apply § 2G2.4(c)(1)'s cross reference. We will vacate Harvey's sentence and remand for resentencing. 18 U.S.C. § 3742(f)(1); *see Williams v. United States,* —— U.S. ——, ——, 112 S.Ct. 1112, 1120, 117 L.Ed.2d 341 (1992); *United States v. Sellers,* 975 F.2d 149, 151 (5th Cir.1992). In doing so, we recognize the unique circumstances of this case. The district court's miscalculations largely offset one another: improper application of § 4A1.3 resulted in an offense level of 22 but proper application of § 2G2.4(c)(1)'s cross reference would have resulted in an offense level of 25. Although Harvey should be sentenced under § 2G2.4(c)(1)'s cross reference, we believe, and the government agrees, that because the government did not file a cross-appeal fundamental fairness dictates that Harvey not receive a higher sentence than the one imposed initially. *See supra* Part IVA. On remand, we direct the district court to impose a sentence no greater than forty-eight (48) months. *See* 18 U.S.C. § 3742(f)(1) ("[i]f the court of appeals determines that the sentence ... was ... imposed as a result of an incorrect application of the sentencing guidelines, the court shall remand the case for further sentencing proceedings with such instructions as the court considers appropriate").

## VI.

Harvey also contends the district court erred by requiring him to make a $5,000 donation to the Pittsburgh Coalition Against Pornography and pay incarceration costs of $17,904. We agree.

■ We find nothing in the Sentencing Reform Act or the Sentencing Guidelines permitting the court to order a defendant to make a donation to a charitable organization. *See generally* 18 U.S.C. § 3551 *et. seq.;* U.S.S.G. § 5E1.1 (restitution); § 5E1.2 (fines); § 5E1.3 (special assessment); § 5E1.4 (forfeiture). Indeed, at oral argument, the government conceded "that the $5,000 contribution is an invalid sentencing provision."

■ Moreover, we recently held the Sentencing Reform Act does not authorize payment of incarceration costs. *United States v. Spiropoulos,* 976 F.2d 155, 168–69 (3d Cir. 1992).[14] We explained that "[r]ecouping the costs of imprisonment has nothing to do with the nature or the seriousness of the offense," *id.* at 165, and that a fine based on the costs of incarceration was invalid. Therefore, Harvey's assessment for incarceration costs was invalid.

In addition to the donation and the costs of incarceration, the district judge ordered Harvey to pay a fine of $10,000—a fine below the Guideline maximum for Harvey's offense level. *See* U.S.S.G. § 5E1.2(c)(3). Because the district judge might have imposed a higher fine in lieu of the other assessments, especially considering Harvey's substantial assets, *see* U.S.S.G. § 5E1.2(d)(2), the district judge on remand may recraft the fine to fulfill his original sentencing objectives. *See* U.S.S.G. § 5E1.2(e); *United States v. Guevremont,* 829 F.2d 423, 428 (3d Cir.1987); *see also United States v. Carter,* 978 F.2d 817, 819 (2d Cir.1992).

## VII.

Because we believe the warrant was based on probable cause, we will affirm the district court's judgment on Harvey's motion to suppress. However, we will vacate the sentence and remand for resentencing. Within the limitation noted above, the district court is free, on remand, to re-fashion Harvey's sen-

---

**14.** The sentencing hearing occurred before we    decided *Spiropoulos.*

tence to effectuate its original sentencing objectives.