USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1727 UNITED STATES OF AMERICA, Appellee, v. FRANKLIN M. GOLDMAN, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. A. David Mazzone, U.S. District Judge] ___________________ ____________________ Before Cyr, Boudin and Stahl, Circuit Judges. ______________ ____________________ Dana A. Curhan, by Appointment of the Court, for appellant. ______________ Geoffrey E. Hobart, Assistant United States Attorney, with whom ___________________ Donald K. Stern, United States Attorney, was on brief for the United _______________ States. ____________________ December 9, 1994 ____________________ BOUDIN, Circuit Judge. Franklin Goldman was arrested on _____________ July 17, 1992, and charged, in a superseding indictment, with conspiring to possess cocaine with intent to distribute it and with actually possessing cocaine with intent to distribute. Also indicted were David St. Peter, who had acted as an intermediary and Robert Sungy, who apparently played the role of lookout. In October 1992, St. Peter and Sungy pled guilty. Goldman was tried by a jury in December 1992. We describe the trial evidence in condensed form because, while the sufficiency of the evidence is not challenged, some understanding of the facts is relevant to the appeal. At Goldman's trial, the government's evidence showed that a confidential informant acting under the direction of Drug Enforcement Administration agents had purchased small quantities of cocaine from St. Peter in February 1992. The informant then began to discuss with St. Peter the possibility of making large scale purchases. In May 1992, in Peabody, Massachusetts, the informant introduced St. Peter to DEA Special Agent Pamela Mersky, who purported to be the girlfriend of a cocaine trafficker. Mersky asked to purchase multiple kilograms of cocaine from St. Peter. St. Peter asserted that he had a local Massachusetts source for cocaine and would talk to him shortly about price. On July 13, 1992, Mersky and St. Peter -2- -2- met again. St. Peter advised Mersky that the price would be $29,000 per kilogram. Mersky asked to purchase five kilograms. St. Peter met the next day with Goldman, who said that a transaction of one to five kilograms would not be a problem. On July 17, 1992, St. Peter and Mersky met and arranged for the sale to her of four kilograms in two installments of two kilograms each. St. Peter then went alone to the Royal Sonesta Hotel in Cambridge where he was seen meeting with Goldman and the transaction was discussed. St. Peter then met twice with Mersky and assured her that the arrangements were proceeding. Subsequently, Goldman and St. Peter met again near the hotel to discuss the mechanics of the transaction. Ultimately, after a rendezvous at a nearby garage, both St. Peter and Goldman proceeded in separate cars to a restaurant parking lot in Saugus. At the parking lot, government agents saw St. Peter and Goldman meet at the rear of Goldman's car. The trunk contained a brown paper bag, Goldman told St. Peter to "take one," and St. Peter looked in the bag and saw what appeared to be three kilograms of cocaine. St. Peter took one kilogram, and Goldman advised him to take it, bring back the money, and then the transaction would be repeated. St. Peter then drove alone to a nearby Sears parking lot and met Mersky. When St. Peter showed her the kilogram, she asked -3- -3- where the other kilogram was located, and St. Peter said that it was nearby. Shortly thereafter, St. Peter was arrested. After St. Peter left Goldman, Goldman drove some distance away, reversed direction, and ultimately parked his car in a K-Mart parking lot. He then left the car, crossed the road, and climbed a bridge that gave him a vantage point to see the parking lot of the Sears store where St. Peter and Mersky were meeting. As Goldman was looking in this direction, he was approached by a state trooper, began to run, apparently abandoned his car keys, and was ultimately apprehended. After Goldman was arrested, agents took his car to a nearby state police barracks. There a search of the trunk revealed the two kilograms of cocaine in a paper bag, as well as over $5,000 in cash and a cellular phone. The most damning evidence at trial, apart from the cocaine seized from Goldman's car, came from St. Peter who testified against Goldman, described their conversations, and identified Goldman as the source of cocaine that St. Peter had distributed both in this instance and on prior occasions. The jury convicted Goldman on both the conspiracy and possession counts. On April 24, 1993, the court sentenced Goldman to 262 months' imprisonment and, three days later, corrected the sentence and resentenced Goldman to 360 months' imprisonment. -4- -4- On this appeal, Goldman first challenges the admissibility of the evidence seized from his car. This claim was preserved because Goldman moved to suppress the evidence prior to trial. After argument but without an evidentiary hearing, the district court denied the motion to suppress based on affidavits from the law enforcement agents describing the information available to them at the time of the seizure. We take it that no evidentiary hearing was held because there were no disputed facts. The Supreme Court has ruled that an automobile may be searched without a warrant if the police have probable cause to believe that it contains contraband or evidence of a crime. United States v. Ross, 456 U.S. 798 (1982); see _____________ ____ ___ United States v. Infante-Ruiz, 13 F.3d 498, 502 (1st Cir. _____________ ____________ 1994). Applying this standard requires us to disregard the most potent evidence against Goldman--St. Peter's trial testimony and the cocaine found in the trunk of Goldman's car--and focus upon what the agents knew at the time that they searched the car. Since what the agents knew is apparently not disputed, we will treat the application of the probable cause standard to known facts as a legal issue subject to de novo review. ________ See United States v. 255 Broadway, 9 F.3d 1000, 1004 (1st ___ _____________ _____________ Cir. 1994). There is no indication that, at the time of his arrest, Goldman had been identified by St. Peter as the -5- -5- source of the cocaine. What the agents knew was that St. Peter, claiming to have a local source, had agreed with Mersky to make a multi-kilogram delivery on July 17. Thereafter Goldman was seen later that day conferring with St. Peter at the hotel in Cambridge and afterwards St. Peter twice assured Mersky that the transaction was proceeding. This turn was followed by further observed meetings between Goldman and St. Peter at the Cambridge hotel, then at a nearby garage, and finally in the restaurant parking lot in Saugus where agents saw St. Peter and Goldman together at the rear of Goldman's car with the trunk open. This was followed by St. Peter's delivery of one kilogram of cocaine to Mersky at a nearby site and St. Peter's explanation that the other kilogram of cocaine was close at hand. Accordingly, at the time Goldman's car was searched, the police based on these observations had good reason to believe that he was the source of the cocaine, had supplied from his car the kilogram delivered to Mersky, and had possessed the remaining kilogram nearby the delivery site. When the missing kilogram was not found on Goldman's person at the time of his arrest, there was further reason to believe that it was in his car. This surely gave probable cause to search the car without dwelling upon Goldman's apparent attempt to dispose of his car keys before he was apprehended. -6- -6- Goldman's second claim of error concerns impeachment evidence. Goldman's defense, at least in part, rested on the suggestion that the cocaine was planted in his car trunk, probably by St. Peter. During the trial, defense counsel said that Goldman desired to testify, apparently in order to deny that the cocaine in the car trunk was his or had been known to him. Counsel asked the court to rule in advance that if Goldman testified, Goldman could not be impeached based on certain "bad acts" alleged by the government. At Goldman's request, the government had supplied a four-page narrative of "uncharged prior bad acts of the defendant which the government will seek to use as impeachment should the defendant take the witness stand at trial." These alleged bad acts included Goldman's involvement in prior drug transactions and attempted drug transactions during 1990 and 1991. Also, the government alleged that Goldman had twice proposed to rob other drug dealers and once admitted to firing shots at the home of someone who had failed to repay a cocaine debt to an accomplice of Goldman. The district judge declined to bar the proposed impeaching material, and Goldman then chose not to testify. In this court, Goldman asserts that the evidence was not proper impeachment evidence under Fed. R. Evid. 404(b); that any probative value it had would have been substantially -7- -7- outweighed by its prejudicial effect and so barred by Fed. R. Evid. 403; and that the court's failure to disallow the impeachment evidence impaired Goldman's opportunity to testify and violated his constitutional right to present evidence in his own defense. We think that a limited portion of the impeachment evidence might have been excludible under Rule 403 but conclude that Goldman cannot raise such issues here because he did not testify. In all likelihood, the government intended to question Goldman about his prior drug dealings on the theory that those dealings, if admitted, made it more likely that he was lying when he expressed ignorance of the drugs in his car trunk. There is case law that supports this general theory of impeachment, see, e.g., United States v. Fortes, 619 F.2d ___ ____ ______________ ______ 108 (1st Cir. 1980), which (like several impeachment devices) is not expressly described in the Federal Rules of Evidence.1 At least where knowledge is in dispute, such evidence of prior similar crimes might well have greater logical relevance than mere character/propensity evidence excluded under Rule 404(a). See Fed. R. Evid. 404(b) ___ (exception for crimes or wrongs offered to show motive, knowledge, absence of mistake).  ____________________ 1Fed. R. Evid. 608(b) permits the witness to be questioned about prior bad acts for the purpose of attacking the witness' character for veracity, but this theory was not available here because under Rule 608(b) the "bad acts" must be "probative of . . . untruthfulness." -8- -8- Of course, even if otherwise admissible on this impeachment theory, the questioning of Goldman about such prior bad acts (the government apparently did not propose to use extrinsic evidence) would still have to be tested under Rule 403's prejudice standard. Without belittling the possibility of constitutional objection as well, see Fed. R. ___ Evid. 608(b) advisory committee's note, we think that any impeachment so unreasonable as to threaten the defendant's constitutional right to present evidence would already be precluded under the Rule 403 balancing test. In all events, the government's proposed questioning about prior violence or threats of violence by Goldman might raise serious questions under Rule 403's balancing test even if the rest of the testimony were admissible. We need not resolve any of these questions, because the Supreme Court has ruled unequivocally that a defendant does not preserve such objections to impeaching evidence unless the defendant chooses to testify at trial and the court then allows the impeachment over the defendant's objection. Luce ____ v. United States, 469 U.S. 38 (1984). Although Luce involved _____________ ____ impeachment by conviction under Rule 609, the reasons given by the Supreme Court for requiring the defendant to testify apply with full force to the kind of Rule 403 and 404 objections that are advanced by Goldman in this case. Cf. ___ -9- -9- United States v. Griffin, 818 F.2d 97 (1st Cir.), cert. ______________ _______ _____ denied, 484 U.S. 844 (1987). ______ The Supreme Court's reasons in Luce were multiple and ____ its ruling was unanimous. Luce may seem to some to be a ____ tough rule as applied to so vital an interest as the defendant's opportunity to testify in his own defense. Yet, the Supreme Court's concerns in Luce are also substantial: ____ having a fully developed record of the defendant's testimony to judge the need for and relevance of the impeaching questions; a set of impeaching questions actually asked by the prosecutor; and a final, fully informed decision by the district judge as to which questions to allow. Indeed, we have some doubt whether the district court would have allowed impeachment based on Goldman's threats or acts of violence, especially when his prior drug transactions were available to show knowledge. In any event, Luce is binding upon us.  ____ Goldman's third independent claim of error relates to sentencing and requires less discussion. Goldman, as counsel sensibly concedes, was subject to sentencing under the career offender guideline, U.S.S.G. 4B1.1, because he was at least 18 years old at the time of the offense, the offense involved a controlled substance, and Goldman had at least two prior felony convictions for either a crime of violence or a controlled substance offense. These characteristics place a defendant in criminal history category VI and provide -10- -10- increased base offense levels, depending on the statutory maximum applicable to the offense of conviction. Id. ___ Pertinently, under this guideline a statutory maximum of 25 years or more gives rise to an offense level of 34 and a statutory maximum of life corresponds to an offense level of 37. Id. ___ In this instance, based on the quantity of cocaine attributed to Goldman, the prosecutor advised the district court at sentencing that the statutory maximum for Goldman was 40 years. See 21 U.S.C. 841(b)(1)(B) (40 year maximum ___ for basic offense). The applicable sentencing range was therefore 262 to 327 months, and the district court sentenced Goldman to 262 months' imprisonment. In fact, because Goldman had a prior drug conviction, the statutory maximum properly applicable in his case was life imprisonment. See ___ id. (maximum of life if prior drug felony). ___ Later in the same day, the prosecutor realized his mistake and filed a motion pursuant to Fed. R. Crim. P. 35(c) so advising the court. Rule 35(c) provides that the court within seven days after imposing a sentence may correct a sentence wrongly imposed "as a result of arithmetical, technical, or other clear error." Within three days after the original sentence, the district court conducted a new sentencing hearing, found that the prior sentence had constituted clear error based on a mistake as to the -11- -11- applicable statutory maximum, and resentenced Goldman to the minimum sentence applicable to him under the new calculation, namely, 360 months' imprisonment. On appeal, Goldman's counsel concedes that, as we have earlier held, "[t]he Constitution contains no general rule that prohibits a court from increasing an earlier sentence where the court finds that it was erroneous and that a higher sentence was required by law." DeWitt v. Ventetoulo, 6 F.3d ______ __________ 32, 34 (1st Cir. 1993), cert. denied, 114 S. Ct. 1542 (1994). ____________ We there held that the right to correct an unlawful sentence was not without limits, but we were concerned there with extreme facts: a long delay, actual release of the defendant from custody based on the shorter sentence, singling out of the defendant for a belated increase apparently because of his commission of another offense for which parole revocation would have been available, and other troubling characteristics. Id. at 35-36. There is nothing of that ___ sort in this case. Goldman suggests that because the district court's original miscalculation was based on the government's mistaken reading of the statute, it is fundamentally unfair to impose a higher sentence. United States v. Harvey, 2 F.3d _____________ ______ 1318, 1330 (3d Cir. 1993), is cited for this proposition but does not bear it out. Harvey involved the question whether a ______ sentencing error in favor of the defendant could be fully -12- -12- corrected where the defendant appealed the sentence on other grounds but the government chose not to appeal an error in the defendant's favor. Harvey was thus concerned solely with ______ the consequence of the government's decision not to appeal. As for fundamental fairness, it is difficult to see anything unfair about the district court's decision to correct a clear error in a sentence where the error relates solely to the precise length of a lengthy prison term and the correction is made with great promptness. Goldman does not claim to have relied detrimentally on the mistake, and its correction is surely what the drafters of Rule 35(c) had in mind. Given the complexity of the guidelines, the seven-day window is a well-advised precaution and may operate as readily in favor of the defendant as against him. United ______ States v. Fahm, 13 F.3d 447, 453-54 (1st Cir. 1994).  ______ ____ Affirmed. ________ -13- -13-